IN RE Petition for REINSTATEMENT OF Louis Andrew STOCKMAN, a

Minnesota Attorney, Registration No. 0241210

A15-0689

Supreme Court of Minnesota.

Filed: June 21, 2017

John M. Degnan, Tara R. Duginske, Briggs and Morgan, P.A., Minneapolis, Minnesota, for petitioner.

Susan M. Humiston, Director, Timothy M. Burke, Senior Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for respondent.

## OPINION

PER CURIAM.

Petitioner Louis Andrew Stockman seeks reinstatement to the practice of law under Rule 18, Rules on Lawyers Professional Responsibility (RLPR). Stockman has been the subject of two prior public disciplinary actions, both resulting in suspension. A panel of the Lawyers Professional Responsibility Board recommended against reinstatement, finding that Stockman had "not proven by clear and convincing evidence that he has undergone a moral change." The Director of the Office of Lawyers Professional Responsibility (Director) agrees with the recommendation of

the panel. Stockman challenges the panel's finding that he has not demonstrated the requisite moral change.

We hold that the panel's finding that Stockman has not proven a moral change was clearly erroneous. Based on our independent review of the record, we further hold that Stockman has proven by clear and convincing evidence that he has undergone a moral change. Because Stockman has shown by clear and convincing evidence that he has satisfied the requirements for reinstatement to the practice of law in Minnesota, we grant the petition and reinstate Stockman, subject to a 2-year period of supervised probation.

## FACTS

Petitioner Louis Andrew Stockman was admitted to the practice of law in Minnesota in 1993. Following his admission to the bar, Stockman worked, briefly for a solo practitioner, and then for 12 years at a private law firm. In 2006, Stockman left that firm to open a practice in Duluth, which later became Stockman Law Office, where he practiced personal injury and workers' compensation law.

Stockman has been previously subject to two public disciplinary proceedings and one private admonition. The first proceeding involved trust-account and client-related misconduct that Stockman committed between 2005 and 2010. Stockman's trust-account misconduct included trust-account shortages, commingling client funds and earned fees, failing to maintain trust-account books and records, and failing to return a disputed fee to the trust account. Stockman's client-related misconduct involved improperly loaning money to clients, failing to adequately communicate the basis and rate of his fees, charging an unreasonable fee, and failing to properly establish the lack of an attorney-client relationship, which eventually led to a default judgment for the client. In addition, Stockman neglected client matters by failing to respond to a lawsuit, which resulted in a default judgment, failing to timely respond to discovery requests, failing to diligently pursue cases within the statute of limitations, and failing to respond to settlement offers. In February 2012, we indefinitely suspended Stockman with no right to petition for reinstatement for 5 months. *In re Stockman*, 811 N.W.2d 584, 585 (Minn. 2012) (order).

Shortly after his February 2012 suspension, the Director began investigating allegations of additional client-related misconduct, including neglect and non-communication in two client matters, failing to respond to communications from opposing counsel, failing to timely respond to discovery requests, making a false statement to opposing counsel, and failing to properly supervise another lawyer in his law firm. Stockman also failed to comply with our suspension order by failing to notify parties of his suspension under Rule 26, RLPR, falsely certifying that he had complied with Rule 26, RLPR, holding himself out as licensed to practice law while he was suspended, and engaging in the unauthorized practice of law while suspended. In July 2012, the Director filed a petition for disciplinary action and later filed a supplementary petition. Stockman unconditionally admitted the allegations of misconduct. In February 2013, we extended Stockman's indefinite suspension with no right to petition for reinstatement by 6 months. *In re Stockman*, 826 N.W.2d 530 (Minn. 2013) (order).

While suspended, Stockman remained employed at Stockman Law Office as a

legal assistant supervised by another attorney. Shortly after our second suspension order in February 2013, Stockman's supervising attorney resigned from Stockman Law Office, which by then was known as Injury Law. As a result, the firm had no attorneys to represent its clients. Stockman successfully petitioned a court to appoint a receiver to wind down the firm's operations. As a result of the receivership, in October 2013, Stockman sold the assets of the firm to two attorneys, who integrated the firm into their practice, Vukelich & Malban. Stockman began work as a legal assistant under the supervision of the named partners at Vukelich & Malban, where he remains employed today.

Stockman first petitioned for reinstatement in May 2012, but withdrew the petition after the Director filed the second petition for disciplinary action in July 2012. After our second suspension order in February 2013, Stockman filed his second petition for reinstatement in December 2013. After a panel recommended against reinstatement, Stockman withdrew the petition. We dismissed the petition in February 2015.

In April 2015, Stockman filed his current petition for reinstatement. A panel of the Lawyers Professional Responsibility Board held a hearing, at which Stockman presented four witnesses and testified on his own behalf. The Director presented no witnesses. The panel determined that Stockman had "not proven by clear and convincing evidence that he has undergone a moral change" and recommended against reinstatement. The Director agrees with the panel's recommendation. Stockman challenges the panel's factual findings, conclusions, and recommendation.

## ANALYSIS

■ The responsibility for determining whether to reinstate an attorney rests solely with this court. *In re Kadrie*, 602 N.W.2d 868, 870 (Minn. 1999). A panel's recommendation on reinstatement "receives no deference," and "[w]e independently review the entire record to determine whether an attorney should be reinstated." *In re Dedefo*, 781 N.W.2d 1, 7 (Minn. 2010); *accord In re Singer*, 735 N.W.2d 698, 703 (Minn. 2007). When a party orders a transcript of the panel hearing, as in this case, we uphold the panel's factual findings if they have evidentiary support in the record and are not clearly erroneous. *In re Mose*, 843 N.W.2d 570, 573 (Minn. 2014). Factual findings are clearly erroneous if, after reviewing the record, we are " 'left with the definite and firm conviction that a mistake has been made.' " *In re Lyons*, 780 N.W.2d 629, 635 (Minn. 2010) (quoting *Gjovik v. Strope*, 401 N.W.2d 664, 667 (Minn. 1987)).

■ A suspended attorney seeking reinstatement bears the burden of establishing that reinstatement should be granted. *See In re Jellinger*, 728 N.W.2d 917, 922-23 (Minn. 2007). Requirements for reinstatement include (1) compliance with the conditions of suspension, *In re Mose*, 754 N.W.2d 357, 360 (Minn. 2008), (2) compliance with the requirements of Rule 18, RLPR, and (3) demonstration of a moral change, *Kadrie*, 602 N.W.2d at 870. In addition to these requirements, we weigh five other factors: the attorney's recognition that the conduct was wrong, the length of time since the misconduct and suspension, the seriousness of the misconduct, any physical or mental pressures "susceptible to correction," and the attorney's "intellectual competency to practice law." *Kadrie*, 602 N.W.2d at 870. Because the parties agree that Stockman has complied with the conditions of his suspensions

and completed the requirements of Rule 18, RLPR, the only dispute is whether Stockman has demonstrated a moral change.

### I.

▇▇▇ Showing a moral change is the most important factor in the determination of whether to reinstate an attorney. *In re Reutter*, 474 N.W.2d 343, 345 (Minn. 1991). An attorney "must prove by clear and convincing evidence that he [or she] has undergone a moral change such that clients can have complete confidence in his [or her] competence and morality." *In re Anderley*, 696 N.W.2d 380, 384-85 (Minn. 2005). To prove a moral change, "a lawyer must show remorse and acceptance of responsibility for the misconduct, a change in the lawyer's conduct and state of mind that corrects the underlying misconduct that led to the suspension, and a renewed commitment to the ethical practice of law." *Mose*, 843 N.W.2d at 575. "Such evidence 'must come not only from an observed record of appropriate conduct, but from the [attorney's] own state of mind and his [or her] values.'" *Id.* (quoting *In re Swanson*, 405 N.W.2d 892, 893 (Minn. 1987)).

*Remorse and acceptance of responsibility for the misconduct*

▇▇ To establish a moral change, Stockman must first prove that he "show[s] remorse and acceptance of responsibility for the misconduct." *Id.* The panel found that Stockman "expresses remorse" for his actions. This finding is not disputed by the parties, is supported by the record, and was not clearly erroneous.

However, the panel also found that Stockman had minimized his misconduct, suggesting that he had not fully accepted responsibility for his actions. The panel found that Stockman minimized his misconduct based on three exchanges at the hearing. First, the panel found that, despite having previously admitted to sharing fees with a non-lawyer in his stipulation for discipline that led to our February 2012 order, Stockman offered evidence at the hearing that he did not, in fact, share fees with a non-lawyer. *See* Minn. R. Prof. Conduct 5.4(a). We have reviewed the record carefully and have determined that Stockman never admitted to the fee-sharing allegation. Our February 2012 suspension order incorrectly stated that Stockman had admitted to the allegations of "all three petitions" submitted by the Director—the original, the amended supplementary, and the second supplementary. Stockman, however, did not admit to the allegations in the original petition, which was the only petition that contained the fee-sharing allegation. Both parties now represent to us that this particular panel finding was clearly erroneous, and we agree.

Second, the panel found evidence of minimization when Stockman discussed his prior misconduct for failure to communicate with a client. According to the panel, during his testimony, Stockman "explained that despite his client's dissatisfaction, he believed the end result was very good but admitted that maybe he did not communicate adequately with that client." Stockman argues that this was an attempt to explain, not minimize his misconduct, and that his testimony established that he "reexamine[d] his prior actions" and understood how they occurred.

We previously addressed a similar issue in another attorney reinstatement case. In *Dedefo*, a panel cited the attorney's "continuing resort to cultural concerns to ex-

plain and defend his actions" as a reason to deny reinstatement. 781 N.W.2d at 10 (internal quotation marks omitted). We disagreed, concluding that the explanation was *not* an attempt to "minimize his wrongdoing," but that instead Dedefo "explained elements of his culture in order to show his understanding of how and why the misconduct occurred in the past and how he now perceives and rejects the wrongfulness of his previous conduct." *Id.* (citation omitted) (internal quotation marks omitted).

As in *Dedefo*, Stockman's discussion of the circumstances of this incident reveals that he has reflected on his misconduct and understands how and why the misconduct occurred. Stockman testified that, "[a]lthough the result, I think, was actually a nice result, I failed her, and it was my job as her attorney." Instead of minimizing, this explanation reveals that Stockman understood and acknowledged the misconduct that he had committed. And as we concluded in *Dedefo*, we are convinced that Stockman's testimony demonstrates that he *now* considers this conduct inappropriate. Stockman testified: "I think one of the main jobs of an attorney no matter what type of legal stuff they're doing is about communication. I did not communicate well enough with her, explain it well enough to her so she understood what she was facing under the law." He further stated that, "[i]t was my job to break it down for her so she ... plainly understood it." We therefore conclude that the panel's second finding of minimization is unsupported by the record and was therefore clearly erroneous.

Third, the panel determined that Stockman was not candid during his testimony about the extent of his participation in an April 2012 mediation, which occurred during his suspension. In his direct testimony, Stockman characterized his participation in the mediation as "not participat[ing] in the mediation other than sitting there for 20 minutes." On cross-examination, however, Stockman acknowledged that in prior disciplinary proceedings, he admitted participating substantively by "stat[ing] [his] opinion regarding an administrative ruling that a prior termination of the client was not ... for cause as claimed by the employer."

Despite his apparent reluctance to fully disclose the extent of this misconduct on direct examination, countervailing considerations impact our evaluation of the panel's finding that Stockman minimized his misconduct with respect to this instance. Stockman admitted at other points during the hearing that he engaged in the unauthorized practice of law after being suspended in 2012. In addition, and more importantly, Stockman's actions, taken as a whole, clearly demonstrate that Stockman viewed this misconduct as a serious failing and made significant changes in his behavior after the incident to ensure that he would not engage in the unauthorized practice of law. The evidence at the hearing revealed that Stockman stopped attending mediations with the firm's attorneys, even in a shadowing role. Stockman also developed and routinely used a form during meetings and interviews to ensure that clients clearly understood that he was a legal assistant, not an attorney. And Stockman identified himself as a legal assistant when speaking with others on the telephone. Although there is some support in the record for the panel's finding, overwhelming evidence presented at the hearing shows the contrary. Therefore, we remain "left with the definite and firm conviction that a mistake has been made," *Lyons*, 780 N.W.2d at 635 (citation

omitted) (internal quotation marks omitted), and conclude that the panel's finding that Stockman minimized his prior misconduct with respect to the unauthorized practice of law was clearly erroneous.

*Change in conduct and state of mind*

■ The second requirement for establishing a moral change by clear and convincing evidence is to prove "a change in [his] conduct and state of mind that corrects the underlying misconduct that led to the suspension." *Mose*, 843 N.W.2d at 575. The panel determined that Stockman had not established that his conduct or state of mind indicated a moral change.

Stockman presented witness testimony to demonstrate an observed record of changed conduct and state of mind that corrects the underlying misconduct that led to his suspension. The panel found that the testimony from Stockman's witnesses was insufficient to demonstrate conduct indicative of a moral change. Specifically, the panel found that neither the testimony of David Malban nor John Vukelich, his supervising attorneys, provided evidence "that [Stockman] had engaged in any in-depth conversations about the past misconduct, causes of such misconduct, or a plan

to address and prevent any future misconduct."[1]

■ The testimony of Malban and Vukelich, Stockman's direct supervisors, is the most probative evidence of an observed record of Stockman's change in conduct and state of mind. We do not consider witness testimony in isolation; rather, we consider the "overall record." *In re Brown*, 467 N.W.2d 622, 625 (Minn. 1991); *accord In re Trygstad*, 472 N.W.2d 137, 140 (Minn. 1991) (evaluating "whether petitioner's overall record of conduct justifies the trust which clients, the court, and others must be able to have in petitioner if he were to be reinstated"). Considered together, the testimony of Malban and Vukelich reveal that Stockman has changed his conduct and state of mind. Because the panel failed to adequately consider the testimony of both witnesses together, we conclude that the panel's finding that Stockman's witnesses did not establish an observed record of change in Stockman's conduct and state of mind was clearly erroneous. *See Lyons*, 780 N.W.2d at 635 (explaining that a referee's findings are clearly erroneous when we are "left with the definite and firm conviction that a mistake has been made" (citation omitted) (internal quotation marks omitted)).

---

1. The panel also found that Stockman had "little true 'insight' into the causes of the past misconduct," other than to say he believed he was trying to help people too much. This finding is not clearly erroneous. Stockman committed a wide variety of misconduct, including neglect of client matters and failure to communicate with clients, trust-account violations, practicing law while suspended, making a false statement to opposing counsel, and falsely certifying he had complied with the notice requirements for suspended lawyers in Rule 26, RLPR. Stockman had no explanation for his trust-account violations, other than to say that when he started his own law firm after practicing law for 13 years, he was unaware of these requirements. And our review of the record reveals that Stockman offered

no explanation for why he engaged in the unauthorized practice of law or made false statements.

Nevertheless, other findings regarding a lack of moral change were clearly erroneous. There is also substantial evidence in the record showing a change in Stockman's conduct and state of mind that corrects the underlying misconduct that led to the suspension. As a result, we are "left with the definite and firm conviction that a mistake has been made," *Lyons*, 780 N.W.2d at 635 (citation omitted) (internal quotation marks omitted), and we cannot uphold the panel's finding that Stockman failed to prove a moral change.

Both Malban and Vukelich testified about the changes in Stockman's conduct since the disciplinary proceedings. Regarding Stockman's unauthorized practice of law, both supervising attorneys noted that while working at their firm, there were clear restrictions on what Stockman was permitted to do while suspended and that Stockman followed these restrictions. Vukelich commented that he was "not surprised" that there were over 450 forms presented by Stockman and signed by clients that made clear that Stockman was a legal assistant because Stockman would ask to have the client sign the form each time they met. Vukelich testified that Stockman was hesitant to engage in certain types of conduct for which he had previously been disciplined, even after he was encouraged to do so. For example, Vukelich testified that he "would invite [Stockman] along to attend the mediation[s] just to observe other lawyers and see how they assess the case and how they handle it," but that Stockman would always decline to attend because of his prior misconduct.

Much of Stockman's client-related misconduct involved a lack of diligence and the failure to communicate with clients. Both Malban and Vukelich testified that Stockman worked diligently on cases and that he effectively communicated with the firm's clients. Both testified about the competent manner in which Stockman routinely assisted them with their cases, including preparing cases for trial. They each testified that on a daily basis, Stockman responded to communications from clients and showed real concern for them.

Malban and Vukelich also testified about their conversations with Stockman about his prior misconduct, the causes of the misconduct, and his plans to prevent future misconduct. Malban testified that he and Stockman would "review" the rule of professional conduct governing the employment of a suspended attorney "every now and then," normally when Stockman himself brought it up in response to his potential involvement in a case. Malban described how Stockman considered the lessons from previous disciplinary and reinstatement proceedings as a "playbook" to be a better attorney. Vukelich testified that he had a "heart-to-heart" conversation with Stockman about his misconduct and the causes of it, including that Stockman had taken on too much responsibility and could not adequately manage the volume of his caseload.

In addition, testimony by Stockman demonstrates a changed state of mind. He testified that he failed his clients by failing to "communicate well enough," failing to "do things soon enough," failing to "do [things] well enough," and in some cases, failing to do things at all. Through his work at Vukelich & Malban, Stockman testified that he had learned ways to avoid similar client-related misconduct in the future. Stockman provided examples of specific steps that he could take to avoid similar client-related misconduct in the future, including communicating earlier with clients and working on certain issues sooner in a case. Stockman's testimony also revealed insight into what caused him to take on too many clients. He explained that he took on too many clients because he was seeking too much personal validation through his work and that he had learned skills to address this issue by working with his therapist.

Stockman's own testimony regarding his changed state of mind is further bolstered by the written reports from his therapist. Although the panel's findings only mention

the therapist's observations to demonstrate that Stockman has the "ability" to "make [ ] adjustments," the reports also reveal that Stockman has not "displayed any minimization [of] any of the problems that occurred," has "made significant life changes over the last couple of years," has taken discussions from therapy sessions and had "further conversations ... with ... friends, colleagues and family which indicate[ ] both the depth of remorse [and] also his desire to not make mistakes in the future." The reports also indicated that "remorse and learning from past mistakes" is "being accomplished and will continue."

Based on our independent review of the record, we conclude that Stockman proved "a change in [his] conduct and state of mind that corrects the underlying misconduct that led to the suspension." *Mose*, 843 N.W.2d at 575.

*Renewed commitment to the ethical practice of law*

▇▇▇ Finally, to prove a moral change by clear and convincing evidence, Stockman must show "a renewed commitment to the ethical practice of law." *Mose*, 843 N.W.2d at 575. The panel concluded that Stockman did not demonstrate a strong commitment to reform. In support of this conclusion, the panel cited Stockman's 3-year delay in taking a trust-account continuing legal education course, which had been recommended by a panel in a prior reinstatement proceeding in November 2014. The Director agrees with the panel that Stockman has not demonstrated a strong commitment to reform, citing in part the delay in taking the recommended course. Stockman disagrees that the delay evidences a lack of commitment to reform because the course was not offered at an earlier time.

We agree with Stockman that the panel's conclusion was not a fair characterization of his commitment to reform for two reasons. First, Stockman testified that the trust-account course was not available for 2 or 3 years before November 2015. This testimony was not contradicted by the Director. Therefore, nothing in the record suggests that Stockman could have taken the course any sooner than he did. *See Kadrie*, 602 N.W.2d at 869-71 (rejecting a panel's conclusion that an attorney's 6-year delay in satisfying a judgment demonstrated a lack of "desire to rectify or atone for harm" because the record "demonstrates that [the attorney] could not have satisfied the judgment" earlier because of his financial situation). Second, we have held that "the appropriate inquiry is *not* whether the petitioning attorney underwent a moral change ... *immediately* upon being suspended. Rather, we examine a petitioner's conduct up to the time of the reinstatement hearing." *Dedefo*, 781 N.W.2d at 9 (emphasis added). The panel's negative inference from Stockman's failure to immediately take the recommended course is inconsistent with the requirement to consider all evidence of a moral change up to the time of the panel hearing. Therefore, we conclude that the panel erred in relying on the timing of Stockman's CLE course.

The record contains evidence of Stockman's commitment to reform. In addition to the evidence we have already discussed demonstrating Stockman's changed conduct and state of mind, Stockman has taken continuing legal education coursework in the subject areas of his past misconduct and testified that he intends to use this coursework to improve his skills as an attorney. We also "consider[ ] whether a petitioner has a career plan in place for after reinstatement." *Mose*, 754 N.W.2d at 363. It is significant that Stockman has continued working as a legal assistant during his suspension, under attorneys who

have supervised him without incident for 3 years, and who have demonstrated a commitment to continue to mentor him as an associate if Stockman were reinstated. Based on our independent review of the record, we conclude that Stockman has demonstrated a renewed commitment to the ethical practice of law.

In summary, we hold that the panel's finding that petitioner has not proven a moral change was clearly erroneous. Based on our independent review of the record, we hold that Stockman has proven by clear and convincing evidence that he has undergone a moral change.

## II.

In addition to the three requirements for reinstatement already addressed, our case law establishes five additional factors that we weigh to guide our determination of whether an attorney should be reinstated: the attorney's recognition that the conduct was wrong, the length of time since the misconduct and suspension, the seriousness of the misconduct, any physical or mental pressures "susceptible to correction," and the attorney's "intellectual competency to practice law." *Kadrie*, 602 N.W.2d at 870. The panel's findings, conclusions, and recommendation did not address these factors. These factors, however, are a part of our determination of whether an attorney has met the burden for reinstatement. We therefore consider the five factors below.

*Recognition that the conduct was wrong*

 We have previously recognized that the requirement of a moral change and the factor regarding an attorney's recognition of the wrongfulness of the conduct are "intertwined" and we have "considered these factors together." *Dedefo*, 781

N.W.2d at 8; *see e.g., In re Holker*, 765 N.W.2d 633, 638-39 (Minn. 2009). Here, the panel found that Stockman "acknowledges responsibility for the conduct and expresses remorse." The record reveals that Stockman took responsibility for his actions, and the Director does not dispute the panel's finding that Stockman has shown remorse for his conduct. Stockman's recognition of the wrongfulness of his misconduct weighs in his favor.

*Length of time since the original misconduct*

 We have held that a "long period of time between [the] misconduct and [the] petition for reinstatement weighs in favor of reinstatement." *Mose*, 754 N.W.2d at 364. The conduct for which Stockman was suspended occurred between 2005 and 2012, which is between 5 and 12 years ago. In addition, Stockman was eligible to seek reinstatement more than 3 years ago. This factor weighs in Stockman's favor.

*Seriousness of the misconduct*

 We have held that reinstatement of an attorney "must be considered in light of the offenses" for which he or she was disciplined. *In re Wegner*, 417 N.W.2d 97, 100 (Minn. 1987). However, "even serious misconduct should not bar reinstatement when the petitioner has undergone the imposed discipline." *Mose*, 754 N.W.2d at 364. For example, in *Kadrie*, we acknowledged that "[p]etitioner's misdeeds were indeed very serious," but determined that the length of petitioner's suspension was adequate to account for "the seriousness of his misdeeds," and that because "petitioner ha[d] undergone the discipline this court imposed for his actions, those actions, while serious, should not bar his reinstatement." 602 N.W.2d at 871. We have previ-

ously reinstated attorneys who had committed such serious misconduct that they had been disbarred. *See, e.g., In re Lieber*, 834 N.W.2d 200, 201-02 (Minn. 2013) (reinstating an attorney who defrauded clients, lied under oath, and misused a trust account); *In re Ramirez*, 719 N.W.2d 920, 921-22 (Minn. 2006) (reinstating an attorney who committed misconduct that violated state law, resulting in imprisonment). In light of our previous reinstatement of attorneys whose conduct resulted in disbarment, this factor weighs neutrally.

### Physical or mental pressures susceptible to correction

Concerning physical or mental pressures susceptible to correction, the panel noted that Stockman's therapist provided evidence of " 'a clear ability to utilize the remorse and take the appropriate actions to make the adjustments that it takes to not make the mistakes in the future.' " At the same time, neither party suggests that a physical or mental-health issue caused or contributed to Stockman's misconduct. This factor is neutral.

### Intellectual competency to practice law

We have "no fixed standard in reinstatement proceedings by which we determine a petitioner's intellectual competency to return to practice." *Kadrie*, 602 N.W.2d at 873. We generally consider the extent to which petitioner has " 'remained acquainted with legal matters.' " *Lieber*, 834 N.W.2d at 209 (quoting *Trygstad*, 472 N.W.2d at 139). The Director does not dispute Stockman's competency. Since his suspension in 2012, Stockman has worked continuously as a legal assistant, ensuring that he remains acquainted with legal matters, and more significantly, at the firm at which he is likely to practice upon his reinstatement. Stockman has worked in his former areas of specialty, under the direct supervision of practicing attorneys. Both of his supervising attorneys testified to his "extreme" competence in the areas of law in which they practice. This factor weighs heavily in Stockman's favor.

In sum, we conclude that Stockman has shown by clear and convincing evidence that he has satisfied the requirements for reinstatement to the practice of law in Minnesota. We therefore reinstate Stockman, order him to become current in the payment of his annual registration fee within 30 days of the date of this decision, and place him on supervised probation for a period of 2 years, subject to the following conditions:

(1) Stockman shall abide by the Minnesota Rules of Professional Conduct.

(2) Stockman shall cooperate fully with the Director's office in its efforts to monitor compliance with probation and promptly respond to the Director's correspondence by the due date. Stockman shall provide to the Director a current mailing address and shall immediately notify the Director of any change of address. Stockman shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention. Upon the Director's request, Stockman shall authorize the release of information and documentation to verify compliance with the terms of this probation.

(3) Stockman shall be supervised by a licensed Minnesota attorney appointed by the Director to monitor compliance with the terms of his probation. Within 14 days of the date of this decision, Stockman shall provide to the Director the names of four attorneys who have

agreed to be nominated as Stockman's supervisor. If, after diligent effort, Stockman is unable to locate a supervisor acceptable to the Director, the Director shall appoint a supervisor. Until a supervisor has signed a consent to supervise, Stockman shall, on the first day of each month, provide the Director with an inventory of active client files described in paragraph (4) below. Stockman shall make active files available to the Director upon request.

(4) Stockman shall cooperate fully with the supervisor in his or her efforts to monitor compliance with this probation. Stockman shall contact the supervisor and schedule a minimum of one in-person meeting per calendar quarter. Stockman shall submit to the supervisor an inventory of all active client files by the first day of each month during the probation. With respect to each active file, the inventory shall disclose the client name, type of representation, date opened, most recent activity, next anticipated action, and anticipated closing date. Stockman's supervisor shall file written reports with the Director at least quarterly, or at such more frequent intervals as the Director may reasonably request.

(5) Stockman shall initiate and maintain office procedures that ensure that there are prompt responses to correspondence, telephone calls, and other important communications from clients, courts, and other persons interested in the matters that Stockman is handling, and that will ensure that Stockman regularly reviews each and every file and completes legal matters on a timely basis.

(6) Within 30 days of the date of this decision, Stockman shall provide to the Director and to the probation supervisor, if any, a written plan outlining office procedures designed to ensure that he is in compliance with probation requirements. Stockman shall provide progress reports as requested.

(7) Stockman shall maintain trust-account books and records in compliance with Minn. R. Prof. Conduct 1.15 and Appendix 1 thereto. These books and records include the following: client subsidiary ledgers, checkbook registers, monthly trial balance reports, monthly reconciliation reports, bank statements, canceled checks (if they are provided with bank statements), duplicate deposit slips, bank reports of interest, service charges, interest payments to the Minnesota IOLTA Program, and bank wire, electronic, or telephone transfer confirmations. Such books and records shall be made available to the Director within 30 days of the date of this decision and thereafter shall be made available to the Director at such intervals as she deems necessary to determine compliance.

Petition granted.