PER CURIAM.
Petitioner Larry S. Severson has filed a petition for reinstatement to the practice of law. In 2015, we indefinitely suspended Severson, with no right to petition for reinstatement for at least 1 year. After considering Severson's petition, a panel of the Lawyers Professional Responsibility Board recommended reinstatement, concluding that Severson had "prove[n] by clear and convincing evidence that he has undergone the requisite moral change to render him fit to resume the practice of law and has demonstrated sufficient remorse for his misconduct." The Director of the Office of Lawyers Professional Responsibility challenges a number of the panel's findings and disagrees with the panel's recommendation. Based on our independent review of the record, we hold that the panel's finding that Severson has undergone the necessary moral change was not clearly erroneous. Because Severson has shown by clear and convincing evidence that he has satisfied the requirements for reinstatement to the practice of law in Minnesota, we grant the petition and reinstate Severson, subject to a 2-year period of probation.
FACTS
Severson was admitted to practice law in Minnesota in 1975. On February 18, 2015, we indefinitely suspended Severson, with no right to petition for reinstatement for a minimum of 1 year, for improper business *27 dealings with a client and misrepresentation. In re Severson , 860 N.W.2d 658, 662-63, 674-75 (Minn. 2015). The misconduct for which Severson was disciplined centered on his dealings with D.S., a young woman whose parents had died when she was an infant and who lived with Severson's family as a teenager. Id. at 663. D.S. was the beneficiary of insurance proceeds following her parents' deaths, and her inheritance was placed in a conservatorship. Id. After her eighteenth birthday in April 1996, D.S. received approximately $500,000, the funds that had been in the conservatorship. Id.
Severson offered to invest the $500,000 that D.S. had received from the conservatorship, and in June 1996, the two entered into an investment agreement.[1] Id. At that time, an attorney-client relationship existed between D.S. and Severson. Id. at 667. The investment agreement created a conflict of interest, and Severson's failure to obtain the consent of D.S. was a violation of Minn. R. Prof. Conduct. 1.7(b) (1996). Severson , 860 N.W.2d at 668. Severson also violated Minn. R. Prof. Conduct. 1.8(a) (1996), when he entered into the investment agreement with D. S. Severson , 860 N.W.2d at 668. The terms of the investment agreement were unfair and unreasonable because they did not provide "security for D.S.'s investment, limit the types of investments Severson could make, or provide for a penalty, or the recovery of her funds if Severson did not comply with the agreement." Id. Severson also "did not adequately explain the transaction to D.S. or advise her to seek independent counsel." Id. at 672.
In 2007, D.S. asked Severson to return the $500,000. Id. at 664. Severson did not repay D.S., and by 2008, Severson "was in serious financial trouble." Id. In 2007, Severson acquired an equine facility that he later sold on a contract for deed. Id. The purchasers defaulted on the contract for deed and Severson then assigned his seller's interest in the facility to D.S. as security for what he owed her "and had D.S. sign a $250,000 mortgage regarding their interest in the equine center." Id. Severson once again violated Minn. R. Prof. Conduct 1.7(a)(2), 1.7(b), and 1.8(a),[2] when he assigned his seller's interest to D. S. Severson , 860 N.W.2d at 665, 666 n.5. He also acted dishonestly, in violation of Minn. R. Prof. Conduct 8.4(c) (2008), by having D.S. assign and mortgage her interest in the equine center to his creditors without telling D.S. that his financial insecurity necessitated the assignments and that her funds could be at risk. Severson , 860 N.W.2d at 669.
D.S. eventually hired an attorney to help her recover the $500,000 principal. Id. at 664. She sued Severson, and the parties reached a settlement in December 2010. Id. After paying her attorney fees, D.S. recovered just $300,000 of the original $500,000 that she had given to Severson to invest. Id.
Severson made misrepresentations to D.S. during the course of their legal dispute and to the Director during the disciplinary investigation, in violation of Minn. R. Prof. Conduct 8.1(a)-(b), 8.4(c)-(d). Severson , 860 N.W.2d at 664-65, 669, 672. Severson gave the attorney for D.S. misleading invoices for purported past legal services he had provided to D.S., in an attempt to reduce the amount he owed her. Id. at 664-65, 672. Severson also made a number of misrepresentations to the Director *28 regarding where the funds of D.S. were invested and the legitimacy of his invoices for legal services. Id.
For the misconduct described above, we indefinitely suspended Severson. Id. at 674-75. Severson filed his first petition for reinstatement in 2016. In re Severson , 889 N.W.2d 291, 291 (Minn. 2016) (order). After conducting a hearing, the panel found that Severson did not prove by clear and convincing evidence that he recognized the wrongfulness of his conduct or that he had undergone the requisite moral change. Id. Accordingly, the panel recommended that we deny Severson's petition. Id. Neither party challenged that recommendation, and we denied the petition. Id.
On June 7, 2017, Severson filed the current petition for reinstatement. A panel considered his petition at a hearing. Severson's evidence included a letter he wrote to D.S. and progress notes prepared by K.A., Severson's therapist since February 2017. Severson, K.A., and two character witnesses, S.P. and D.D., testified. The panel issued its findings of fact and recommended that we grant Severson's petition for reinstatement. The Director challenges several of the panel's findings of fact and recommendation.
ANALYSIS
We have the sole responsibility for determining whether an attorney should be reinstated to the practice of law. In re Kadrie , 602 N.W.2d 868, 870 (Minn. 1999). To determine whether reinstatement is appropriate, "[w]e independently review the entire record." In re Singer , 735 N.W.2d 698, 703 (Minn. 2007). Although we consider the panel's recommendations, we are not bound by them. Id. Where, as here, a transcript has been ordered, "we will defer to the panel's credibility assessments and uphold the panel's factual findings if those determinations have factual support in the record and are not clearly erroneous." In re Mose , 843 N.W.2d 570, 573 (Minn. 2014). To conclude that the findings are clearly erroneous, "we must be 'left with the definite and firm conviction that a mistake has been made.' " In re Lyons , 780 N.W.2d 629, 635 (Minn. 2010) (quoting Gjovik v. Strope , 401 N.W.2d 664, 667 (Minn. 1987) ).
A suspended attorney "bears the burden of establishing that reinstatement should be granted." In re Stockman , 896 N.W.2d 851, 856 (Minn. 2017). Reinstatement requirements include: "(1) compliance with the conditions of suspension, (2) compliance with the requirements of Rule 18, [Rules on Lawyers Professional Responsibility ] RLPR, and (3) demonstration of a moral change." Id. (citations omitted). Beyond these three requirements, we "weigh five other factors." Id. Those factors are: "(1) the petitioner's recognition of the wrongfulness of his conduct; (2) the length of time since the original misconduct and the suspension; (3) the seriousness of the original misconduct; (4) the existence of physical or mental illness or pressures that are susceptible to correction; and (5) the petitioner's intellectual competency to practice law." Singer , 735 N.W.2d at 703. Because the parties agree that Severson complied with the conditions of his suspension and has completed the requirements of Rule 18, RLPR, the only dispute before us is whether Severson has demonstrated the requisite moral change and whether the five factors weigh in favor of Severson's reinstatement.
I.
Proof of moral change "is the most important factor" in determining whether an attorney should be reinstated. Stockman , 896 N.W.2d at 857. An attorney seeking reinstatement "must establish by clear and convincing evidence that she or *29 he has undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited." In re Jellinger , 728 N.W.2d 917, 922 (Minn. 2007) (internal quotation marks omitted) (citation omitted). The requisite moral change "must be such that if the petitioner were reinstated, 'clients could submit their most intimate and important affairs to him with complete confidence in both his competence and fidelity.' " Kadrie , 602 N.W.2d at 870 (quoting In re Herman , 293 Minn. 472, 197 N.W.2d 241, 244 (1972) ). In general, "to prove moral change a lawyer must show remorse and acceptance of responsibility for the misconduct, a change in the lawyer's conduct and state of mind that corrects the underlying misconduct that led to the suspension, and a renewed commitment to the ethical practice of law." Mose , 843 N.W.2d at 575. The evidence of this moral change " 'must come not only from an observed record of appropriate conduct, but from the petitioner's own state of mind and his values.' " Id. (quoting In re Swanson , 405 N.W.2d 892, 893 (Minn. 1987) ).
Remorse and acceptance of responsibility for the misconduct
To establish the requisite moral change, Severson must first " 'show remorse and acceptance of responsibility for the misconduct.' " Stockman , 896 N.W.2d at 857 (quoting Mose , 843 N.W.2d at 575 ). The panel made several findings in connection with Severson's remorse and acceptance of responsibility.
The panel found that Severson "expressed remorse." The panel noted Severson's testimony "that he felt remorse and was sorry he caused hurt to D.S." and that "he previously had not understood remorse and ... how to take responsibility." The panel observed that Severson "acknowledged he had previously blamed others when he should have blamed himself." In addition, the panel noted Severson's testimony that D.S. did not have a third party to advise her regarding the lack of security for the investment agreement, that he was now able to understand how D.S. felt, and that he referred to his own conduct as "just wrong" multiple times. In relation to these statements, however, the panel stated that it was "troubled by [their] lack of depth." Nevertheless, the panel noted that Severson testified that accepting responsibility was a gradual process because he had been reluctant to take responsibility for something "that bad," but that he "now accepted that the responsibility was all his." The panel found "[t]here is no yardstick for remorse and the panel believes that, to the extent to which he is capable, he is remorseful for his conduct."
The panel noted Severson's letter to D.S. and found that in it, Severson continued to deflect responsibility for how his conduct affected D.S. and blame his financial circumstances, as opposed to his own choices. The panel, however, found that it was Severson's idea to write the letter, that he worked with his therapist to understand how to convey his remorse, and that he worked hard with his therapist to understand his issues, as well as to change his perceptions and behaviors.
The Director argues that Severson did not meet his burden to prove remorse and acceptance of responsibility by clear and convincing evidence, citing the panel's findings concerning a lack of depth in Severson's remorse and deflection of responsibility in the apology letter to D.S. The Director also claims that the panel ignored contrary evidence on the issue of remorse. Severson argues that he has met his burden of proving his remorse and acceptance of responsibility by clear and convincing evidence. Severson contends that our court has reinstated attorneys even when there *30 was some contrary evidence in the record regarding moral change.
We agree that we have not required an attorney to put forth unassailable evidence of moral change to be reinstated. In the past, "we have ... reinstated attorneys whose conduct since disbarment was not without blemish and/or who continued to struggle with undesirable character traits." In re Ramirez , 719 N.W.2d 920, 926 n.6 (Minn. 2006). In Ramirez , after reviewing the entire record, we concluded that the attorney "ha[d] met the heavy burden of demonstrating her rehabilitation and of proving that she is fit to practice law," despite her failure to fully or candidly answer questions on a job application regarding the misconduct for which she was disbarred. Id. at 926, 926 n.6. The proper inquiry is whether, based on the entire record, the attorney has met his or her burden of proving moral change by clear and convincing evidence. See Stockman , 896 N.W.2d at 862 (holding "that the panel's finding that petitioner has not proven a moral change was clearly erroneous" and that "[b]ased on our independent review of the record, ... [petitioner] ha[d] proven by clear and convincing evidence that he has undergone a moral change").
The Director contends that Severson deflected responsibility for his misconduct by referring to the financial pressures he faced as a result of the economic recession and by minimizing his dishonesty. The Director also raises concerns that Severson "did not disclose [to his character witnesses, D.D. and S.P.] his intent to personally profit from the investments he was making on behalf of D.S." The Director, however, narrowly focuses on small portions of the record in making these arguments, such as certain sentences within Severson's testimony and apology letter, and overlooks the entirety of the evidence in the record. We will affirm the panel's factual findings that an attorney has shown remorse and accepted responsibility for the misconduct if, based on our independent review of the record, the panel's findings are not clearly erroneous and have evidentiary support in the record. In re Griffith , 883 N.W.2d 798, 800-01 (Minn. 2016).
The Director also argues that Severson did not prove adequate remorse because the panel opined that "[t]here is no yardstick for remorse" and concluded that Severson is remorseful for his conduct "to the extent to which he is capable."[3] But we have not required an attorney to express remorse in a particular manner or with a certain degree of expressed emotion. To the extent that the Director's concerns about the adequacy of Severson's remorse go to the credibility of witnesses and the petitioner, we defer to the panel's credibility determinations. Mose , 843 N.W.2d at 573.
Based on our independent review of the entire record, we hold that the panel's finding that Severson "demonstrated sufficient remorse for his misconduct" is not clearly erroneous and is supported by the record.[4] In his testimony, Severson repeatedly *31 said that he was remorseful and that he was solely responsible for his misconduct. For example, in response to a question about how his remorse had evolved since the first reinstatement hearing, Severson replied, "Well, I'm not blaming [D.S.]. I'm not blaming anybody else for what happened" and stated that he "had opportunities in 1996 to do it correctly and I had opportunities in 2002 to do it correctly and maybe other times along the way, but I didn't. I didn't get it done correctly. It was on me, not on somebody else." Severson's character witnesses also testified that they had seen Severson express remorse and take responsibility for his misconduct. S.P. testified that over the course of his meetings with Severson, he saw Severson "take on more personal responsibility" and Severson shifted from "deflection and the demeanor of defense to disclosure and then to remorse." And in describing how that evolution manifested itself, S.P. described Severson's evolution from "strong confidence" to a mindset of "humility" and "remorse." Because the record supports the panel's findings that Severson showed remorse and acceptance of responsibility for his misconduct, Severson met his burden to demonstrate the first aspect of moral change.
Change in conduct and state of mind
Severson must also prove "a change in [his] conduct and state of mind that corrects the underlying misconduct that led to the suspension." Mose , 843 N.W.2d at 575. Such evidence " 'must come not only from an observed record of appropriate conduct, but from the petitioner's own state of mind and his values.' " Kadrie , 602 N.W.2d at 870 (quoting Swanson , 405 N.W.2d at 893 ).
With respect to this factor, the panel relied primarily on the testimony of Severson's therapist, K.A., and her notes from her therapy sessions with Severson. The panel found that while Severson "continued to be defensive and to deflect responsibility" in his initial sessions with K.A., "after working with her regularly for several months, he began to change." Although Severson's progress has been inconsistent, K.A. believed that he was "sincere in his efforts to understand what he did wrong and sincere in his desire to accept responsibility."
After independently reviewing the record, we hold that the panel's findings that Severson proved a change in his conduct and state of mind that corrects the underlying misconduct that led to the suspension are not clearly erroneous. K.A.'s testimony and her therapy notes support the panel's findings on this factor. K.A. described Severson's transition from a person who, at the beginning of the therapy process, just wanted the suspension "to be over" into a person who "was at peace with the work" he was doing in therapy and who was "going to do the best he could do."
In addition, Severson's testimony supports the conclusion that his own state of mind and values have changed. For example, in response to a question regarding what he had learned though the disciplinary proceedings and therapy, Severson said: "Be truthful. If you've got a problem, *32 talk to someone else.... Take responsibility if there is a problem." He also testified that he was willing to continue with therapy so that he could "make sure that I stay where I say I'm going to stay."
Taking this evidence together with the evidence discussed above concerning Severson's remorse and acceptance of responsibility for his misconduct, the panel's conclusion that Severson has proven a change in his conduct and state of mind that corrects the underlying misconduct that led to his suspension is supported by the record and is not clearly erroneous.
Renewed commitment to the ethical practice of law
Finally, to prove moral change, an attorney must demonstrate "a renewed commitment to the ethical practice of law." Mose , 843 N.W.2d at 575. In connection with this aspect of moral change, the panel stated that "[t]here was no dispute [Severson] timely completed the requirements for reinstatement." The panel noted that, although Severson plans to continue working for his present employer in a capacity that does not involve the practice of law, "he also expressed a desire to practice law on a pro bono basis or to help his church." But the panel also expressed uncertainty regarding the applicable standard: "[t]he question was whether [Severson's] lack of a clear plan to return to the active practice of law supported denying reinstatement."
With respect to this aspect of moral change, the Director argues that, to be reinstated, the attorney seeking reinstatement must have "a deliberate plan to return to the practice of law" and "systems in place to avoid future misconduct." The Director relies on two cases for that proposition: Mose , 843 N.W.2d at 576 and Stockman , 896 N.W.2d at 862. These cases do not support the Director's contention.
In Mose , we concluded that the panel's finding that an attorney had not demonstrated moral change was supported by the record. 843 N.W.2d at 575-76. We based our conclusion on several factors, including that Mose had failed to provide evidence of "a deliberate plan to return to the practice of law" and had "not demonstrated that he has a plan to avoid future misconduct." Id. at 576. In Stockman , we held that the panel's findings that the attorney had not shown a renewed commitment to the ethical practice of law were clearly erroneous. 896 N.W.2d at 861-62. We concluded that Stockman had demonstrated a renewed commitment to the ethical practice of law, based on a number of factors, including that he had a job offer as an associate in a firm with attorneys who would mentor him. Id. at 861-62. In short, these cases demonstrate that an attorney's plan to return to the practice of law or implement systems to avoid future misconduct are factors that may be relevant to whether an attorney has shown a renewed commitment to the ethical practice of law.
But we have not rigidly imposed such requirements without regard to the nature of the underlying misconduct and the surrounding circumstances. For instance, in In re Anderley , we reinstated a disbarred attorney without considering whether he had an actual system in place for avoiding future misconduct. See 696 N.W.2d 380, 385-86 (Minn. 2005). We did not discuss whether Anderley had any concrete plan to return to the practice of law. See id. We focused on the fact that Anderley had maintained his sobriety for an extended period of time and had "developed coping skills to deal effectively with his psychological propensities toward anxiety and paranoia." Id. at 385.
Rather than the rigid rule the Director advocates, our precedent reflects a more nuanced approach, accounting for each petitioning attorney's misconduct and circumstances when considering whether *33 moral change has been proven. Severson's misconduct arose in the course of his business dealings with a single client, rather than the more systemic client-related misconduct at issue in Stockman and Mose . See Stockman , 896 N.W.2d at 855-56 (explaining that the attorney's disciplinary history involved a pattern of client-related misconduct, including lack of diligence and competence, failure to communicate with clients, trust-account violations, and practicing law while suspended); Mose , 843 N.W.2d at 576 ("The recurring theme in Mose's disciplinary history is client neglect, failure to follow through on his commitments, and failure to represent his clients diligently.").
At the hearing, Severson testified that although he has "thought a lot about it," at 78 years old, he is unlikely to reenter the practice of law. And although Severson plans to continue working as an administrator for his present employer, he expressed a desire to help his church and to practice law on a pro bono basis. Under the circumstances here, that Severson does not have a specific plan to return to the practice of law is not a barrier to his reinstatement.
In terms of a plan to avoid future misconduct, Severson testified at length that he has reflected on how to assess when someone becomes a client, one of the issues that gave rise to his misconduct. He also testified that he would be careful about viewing family and friends as potential clients. And he testified about a specific instance when his daughter sought help investing the proceeds from the sale of her home, and Severson referred her to a financial adviser. His work with his therapist also reflects a renewed and ongoing commitment to the ethical practice of law.
Based on our review of the record, we conclude that Severson has demonstrated the renewed commitment to the ethical practice of law that our cases require.
II.
Beyond the three requirements for reinstatement discussed above, we weigh five additional factors "to guide our determination of whether an attorney should be reinstated: the attorney's recognition that the conduct was wrong, the length of time since the misconduct and suspension, the seriousness of the misconduct, any physical or mental pressures 'susceptible to correction,' and the attorney's 'intellectual competency to practice law.' " Stockman , 896 N.W.2d at 862 (quoting Kadrie , 602 N.W.2d at 870 ); see also Ramirez , 719 N.W.2d at 924-25. The panel made no findings on these five factors, and the Director argues that it clearly erred by failing to address them. We agree with the Director that the panel erred in failing to address these factors.[5] Because these factors "are a part of our determination of whether an attorney has met the burden for reinstatement," we consider them below. Stockman , 896 N.W.2d at 862.
Severson's recognition that his conduct was wrong
The Director argues that Severson "fails to recognize the wrongfulness of his dishonest conduct." In this case, our analysis of this factor essentially folds into our analysis of whether Severson has undergone the requisite moral change through remorse and acceptance of responsibility for his misconduct. Because Severson has recognized the wrongfulness of his misconduct, and for the reasons *34 addressed above, we conclude that this factor weighs in favor of Severson's reinstatement.
Length of time since the original misconduct and suspension
The parties agree that the length of time since the original misconduct and suspension weighs in favor of Severson's reinstatement. In February 2015, we suspended Severson for a minimum of 1 year. Severson , 860 N.W.2d at 658, 663. Severson has now been suspended for nearly 4 years. We have noted that a "long period of time between [a petitioner's] misconduct and his petition for reinstatement weighs in favor of reinstatement." In re Mose , 754 N.W.2d 357, 364 (Minn. 2008). In Stockman , the attorney committed misconduct between 2005 and 2012 and filed his petition for reinstatement in 2015, more than 3 years after he was eligible to do. See 896 N.W.2d at 855-56, 862. We found that the length of time since Stockman's misconduct weighed in his favor. Id. at 862. Severson committed misconduct between 1996 and 2013 and became eligible for reinstatement approximately two and a half years ago. Here, as in Stockman , this factor weighs in favor of reinstatement.
Seriousness of the original misconduct
We agree with the Director and Severson that Severson committed serious misconduct. See Severson , 860 N.W.2d at 672. When we are satisfied that a petitioning attorney has fulfilled the requirements of reinstatement, we have reinstated attorneys who have committed serious misconduct. See Mose , 754 N.W.2d at 364. The seriousness of an attorney's misconduct "only rarely precludes further consideration of the attorney's petition for reinstatement." Anderley , 696 N.W.2d at 385 n.6 ; see also Ramirez , 719 N.W.2d at 925. And while consideration of past misconduct is one part of our analysis, "we have said that 'even serious misconduct should not bar reinstatement when the petitioner has undergone the imposed discipline.' " In re Dedefo , 781 N.W.2d 1, 11 (Minn. 2010) (quoting Mose , 754 N.W.2d at 364 ).
The Director argues that this factor counsels against reinstatement "given [Severson's] ongoing efforts to continue to minimize the misconduct." But the Director's concerns about how Severson characterizes his misconduct are more appropriately considered in the context of whether Severson has undergone the requisite moral change. The seriousness of Severson's misconduct does not weigh in favor of his reinstatement, but it also does not preclude it. See Anderley , 696 N.W.2d at 385 n.6. Rather, Severson's fitness to practice law should be "considered in light of the offenses for which he ... was [disciplined]." See In re Wegner , 417 N.W.2d 97, 100 (Minn. 1987) ; see also Mose , 754 N.W.2d at 364.
Existence of physical or mental illness or pressures that are susceptible to correction
Severson and the Director agree that Severson has no physical or mental illness. The Director argues, however, that Severson "is still presenting in a defensive manner and still suffering from thought distortions," and that this factor should therefore weigh against reinstatement. We disagree.
Generally, as part of the analysis of this factor, we consider a petitioner's known condition and his or her ability to cope with that condition. For instance, we have considered a petitioner's alcoholism and ability to maintain sobriety. See In re Lieber , 834 N.W.2d 200, 209 (Minn. 2013) ; Anderley , 696 N.W.2d at 385-86. Because no one asserts that Severson has a mental illness or other condition, we need not engage further in this manner of analysis.
*35 Cf. Dedefo , 781 N.W.2d at 11 ; Ramirez , 719 N.W.2d at 925. Rather, the concerns highlighted by the Director are appropriately considered within the context of whether Severson has undergone the requisite moral change. Consequently, this factor supports Severson's reinstatement.
Intellectual competency to practice law
Severson and the Director agree that Severson possesses the intellectual competency to practice law. Although there is no fixed test for intellectual competence, generally we have considered factors such as the petitioner's progress in earning CLE credits and the petitioner's work while suspended. See Mose , 754 N.W.2d at 364-66. Severson is current on his CLE requirements. He passed the Multistate Professional Responsibility Examination (MPRE) in August 2016. And even though Severson's work as an administrator does not involve the practice of law, it does involve coordination of efforts of his employer's outside legal counsel related to real estate acquisitions, contract drafting, litigation, financing, government regulatory matters, and general corporate matters. Accordingly, this factor weighs in favor of Severson's reinstatement.
In sum, based on our independent review of the record, we hold that the panel's findings and conclusions that Severson has proven that he has undergone the requisite moral change are not clearly erroneous. Severson met his burden of showing by clear and convincing evidence that he satisfied each of the requirements for reinstatement to the practice of law. We reinstate Severson, order him to complete payment of his annual registration fee within 30 days of the filing of this decision, and place him on probation for a period of 2 years, subject to certain conditions:
(1) Severson shall abide by the Minnesota Rules of Professional Conduct.
(2) Severson shall cooperate fully with the Director's office in its efforts to ensure compliance with probation and shall promptly respond to the Director's correspondence by the due date provided. Severson shall provide to the Director a current mailing address and shall immediately notify the Director of any change of address. Severson shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention. Upon the Director's request, Severson shall authorize the release of information and documentation to verify his compliance with the terms of this probation.
(3) Severson shall continue treatment with K.A. or a licensed consulting psychologist or other mental-health professional acceptable to the Director and shall complete all therapy programs recommended by the therapist. Severson shall provide the necessary authorizations to allow the Director and any probation supervisor to verify his compliance with treatment, including the disclosure of protected private personal counselling and mental-health information.
(4) If Severson decides to resume practicing law upon reinstatement, he will notify the Director 30 days before resuming the practice of law and will be subject to the following additional conditions for the remainder of his probation:
(a) Severson shall be supervised by a licensed Minnesota attorney, appointed by the Director, to monitor compliance with the terms of this probation. Thirty days before he resumes practicing law, Severson shall provide the Director with the names of three attorneys who have agreed to be nominated *36 as Severson's supervisor. If, after diligent effort, Severson is unable to locate a supervisor acceptable to the Director, the Director shall seek to appoint a supervisor. Until a supervisor has signed a consent to supervise, Severson shall, on the first day of each month, provide the Director with an inventory of client files as described in paragraph (b) below. Severson shall make active client files available to the Director upon request.
(b) Severson shall cooperate fully with the supervisor's efforts to monitor compliance with this probation. Severson shall contact the supervisor and schedule a minimum of one in-person meeting per calendar quarter. Severson shall submit to the supervisor an inventory of all active client files by the first day of each month during the probation. With respect to each active file, the inventory shall disclose the client name, type of representation, date opened, most recent activity, next anticipated action, and anticipated closing date. Severson's supervisor shall file written reports with the Director at least quarterly, or at such more frequent intervals as the Director may reasonably request.
(c) Severson shall be prohibited from entering into business transactions with any current or former clients.
(d) Before agreeing to engage in the practice of law, rendering legal advice, or providing legal services to any potential client, including family members and potential pro bono clients, Severson shall perform comprehensive conflict of interest checks and discuss with his supervisor the existence of any potential conflicts of interest and whether he has a financial interest in any possible transactions. If a conflict exists or if Severson has a financial interest in any possible transactions as to a potential client, Severson shall not agree to represent that potential client, render legal advice, or provide any legal services.
(e) Severson shall not engage in any legal representation which would involve access to client funds until a system of supervision satisfactory to the Director has been established or has been determined by the Director, in her reasonable discretion, to be unnecessary.

The parties orally extended and modified the investment agreement twice. Severson , 860 N.W.2d at 663, 664 n.2.

Unless otherwise noted, citations to the Minnesota Rules of Professional Conduct are to the rules currently in effect.

This comment is an apparent reference to Severson's stoic demeanor or "narrow emotional range," which multiple witnesses discussed during the hearing.

As part of its findings concerning Severson's remorse, the panel found that Severson "continue[d] to deflect responsibility for [D.S.'s] problems and blame financial circumstances, rather than his own decisions" in his apology letter to D.S. This finding lacks support in the record and is therefore clearly erroneous. Although it is true that Severson discussed his failing finances in the letter, he did so in a way that demonstrates "that he has reflected on his misconduct and understands how and why the misconduct occurred" and "now considers this conduct inappropriate." Stockman , 896 N.W.2d at 858 (concluding that the panel's finding that the attorney minimized his misconduct was clearly erroneous because the attorney's testimony about his prior misconduct showed that he now understood how and why it occurred and that it was inappropriate). In his letter, Severson identifies the misconduct that he committed with respect to D.S., states what he should have done differently, and repeatedly states that he is solely to blame for "all of the problems" D.S. "ha[s] experienced from [his] ill-advised and unsecured investment of [her] inheritance." When read in its entirety, the letter is additional support for Severson's remorse and acceptance of responsibility.

Unfortunately, other panels considering petitions for reinstatement have failed to make findings on these specific factors. See Stockman , 896 N.W.2d at 862. We remind panels that they should be making findings on these factors in every reinstatement case.