STATE OF MINNESOTA

IN SUPREME COURT

A23-0265

Original Jurisdiction

Per Curiam
Took no part, Procaccini, J.

In re Petition for Reinstatement of
Scott Selmer, a Minnesota Attorney,
Registration No. 156024.

Filed: April 16, 2025
Office of Appellate Courts

_____

James C. Selmer, J. Selmer Law, P.A., Minneapolis, Minnesota, for petitioner.

Susan M. Humiston, Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for respondent.

_____

S Y L L A B U S

1.      The findings of the Lawyers Professional Responsibility Board panel are not clearly erroneous or inconsistent with our case law.

2.      Based on our independent review of the record, the petitioner has not met his burden of proving moral change or competence to practice law as required for reinstatement.

Petition denied.

O P I N I O N

PER CURIAM.

In 2015, we indefinitely suspended petitioner Scott Selmer from the practice of law. Selmer petitioned for reinstatement in February 2023. Following a hearing, a divided panel

of the Lawyers Professional Responsibility Board recommended against reinstatement, determining that Selmer failed to prove by clear and convincing evidence that he had undergone moral change and was competent to practice law. The dissenting member of the panel found that Selmer had proven his moral change and that he "can be relied on." The Director of the Office of Lawyers Professional Responsibility (the Director) agrees with the recommendation of the panel to deny reinstatement. Selmer contests the panel's findings, conclusions, and recommendation to deny reinstatement.

We determine that the panel's findings are not clearly erroneous or inconsistent with our case law. Based on our independent review of the record, we conclude that Selmer has failed to prove by clear and convincing evidence that he has satisfied the requirements for reinstatement. We therefore deny his petition for reinstatement.

## FACTS

Selmer was admitted to the Wisconsin Bar in 1978 and the Minnesota Bar in 1984. Since his admission to practice, Selmer has had a lengthy disciplinary history.

### *Prior Discipline*

Selmer was first disciplined in 1990, when the Wisconsin Supreme Court privately reprimanded him for practicing law with a suspended license.

Five years later, in 1995, we publicly reprimanded Selmer and placed him on two years' probation for several violations of the Minnesota Rules of Professional Conduct, including abusing the discovery process and misusing litigation "to harass his client." *In re Selmer* (*Selmer I*), 529 N.W.2d 684, 685–88 (Minn. 1995). The Wisconsin Supreme Court publicly reprimanded Selmer and required that he furnish the Board of Attorneys

2

Professional Responsibility a copy of his trust records quarterly. *In re Selmer*, 538 N.W.2d 252, 253–55 (Wis. 1995).

In 1997, we revoked Selmer's probation for new disciplinary violations. *See In re Selmer* (*Selmer II*), 568 N.W.2d 702, 705 (Minn. 1997). These violations included asserting frivolous claims of racial discrimination against creditors to avoid paying his debts, knowingly making false and misleading statements to support these claims, and failing to respond to discovery requests. *Id.* at 704–05. As discipline for the new violations, we suspended Selmer from the practice of law for 12 months and provided that, if reinstated, he would be placed on supervised probation for five years. *Id.* at 705. The Wisconsin Supreme Court also suspended Selmer from the practice of law for 12 months as reciprocal discipline. *In re Selmer*, 595 N.W.2d 373, 374–75 (Wis. 1999).

Three years after we suspended Selmer, he filed a petition for reinstatement. *In re Selmer* (*Selmer III*), 636 N.W.2d 308, 308 (Minn. 2001). In 2001, we granted the petition, reinstating Selmer to the practice of law and placing him on probation for five years. *Id.* at 309. The conditions of Selmer's probation required him to respond in a timely manner to the Director's communications and requests, make a good-faith effort to satisfy outstanding tax liens and civil judgments, and satisfy a Wisconsin disciplinary judgment. *Id.* at 308–09. Just before Selmer's probation ended, the Director filed a petition to revoke Selmer's probation and impose further discipline. *See In re Selmer* (*Selmer IV*), 749 N.W.2d 30, 33 (Minn. 2008). The petition alleged that Selmer failed to comply with the terms of probation, failed to timely file individual income tax returns, and was convicted of fifth-degree assault in violation of Minn. R. Prof. Conduct 8.4(b). *Id.* A

3

referee held a disciplinary hearing and recommended that we publicly reprimand Selmer and release him from probation. *Id.* at 35. We concluded that the recommendation that Selmer receive a public reprimand was appropriate; however, we rejected the referee's recommendation that Selmer be released from probation because Selmer had not fulfilled all of the probationary conditions we had imposed. *Id.* at 36–37. Consequently, in addition to the public reprimand, we placed Selmer on unsupervised probation. *Id.* at 41. The Wisconsin Supreme Court reciprocally disciplined Selmer by publicly reprimanding him. *In re Selmer*, 761 N.W.2d 6, 7 (Wis. 2009).

Selmer's next disciplinary matter—which resulted in his current suspension—occurred seven years later.

***Current Suspension***

In 2015, we indefinitely suspended Selmer, with no right to petition for reinstatement for a minimum of 12 months, based on his conduct in several lawsuits stemming from the suspension of operations of an organization where Selmer served as president and CEO from 2008 to 2011. *In re Selmer* (*Selmer V*), 866 N.W.2d 893, 900–01 (Minn. 2015). His conduct included a pattern of harassing and frivolous litigation, failure to abide by court orders, and refusal to comply with discovery requests. *Id.* at 894–95. We observed that Selmer's dispute with the organization "spanned a significant number of court files at the state district, federal district, and state appellate levels, all of which were dismissed based either on the frivolity of Selmer's arguments or because Selmer failed to comply with court rules." *Id.* at 900. And we concluded that Selmer's abuse of the litigation process constituted "serious" misconduct and emphasized that it

4

formed a pattern of misconduct occurring over several years. *Id.* The Wisconsin Supreme Court reciprocally disciplined Selmer by suspending him from the practice of law for 12 months. *In re Selmer*, 882 N.W.2d 815, 820 (Wis. 2016).

Our 2015 decision provided that Selmer could petition for reinstatement following the 12-month suspension if he satisfied the following conditions: (1) made a good-faith effort to satisfy $11,312 in court-ordered sanctions and costs resulting from the organizational litigation; (2) provided the Director with a payment plan for satisfying the judgments against him; and (3) complied with the requirements of Rule 18, Minnesota Rules on Lawyers Professional Responsibility (RLPR), including successfully completing the professional responsibility portion of the state bar examination and satisfying continuing legal education (CLE) requirements, pursuant to Rule 18(e), RLPR. *Id.* at 901. Our decision also required Selmer to pay $900 in costs, pursuant to Rule 24, RLPR, and to comply with Rule 26, RLPR, which requires notice of suspension to clients, opposing counsel, and tribunals.

Since his suspension in 2015, Selmer has petitioned for reinstatement in Minnesota three times: in 2018, 2019, and 2023. We dismissed Selmer's 2018 petition for failure to pay the filing fee. Selmer withdrew his 2019 petition after he failed the professional responsibility examination. Selmer's 2023 petition is at issue here.

### *Current Reinstatement Proceedings*

Selmer filed his current petition for reinstatement in February 2023. In July 2023, he appeared before a panel of the Lawyers Professional Responsibility Board for a hearing and was represented by counsel. During that hearing, Selmer's counsel planned to argue

5

that some of the conduct that gave rise to Selmer's 2015 suspension was not misconduct. The panel chair explained that a reinstatement hearing was not the proper venue for contesting the 2015 suspension and advised Selmer of the requirements for reinstatement, including proving moral change and competence to practice law. Selmer requested a continuance because his attorney was unprepared to address those requirements.

In March 2024, represented by new counsel, Selmer again appeared before the panel for a hearing held over two days. At the hearing, Selmer testified about his moral change and competence to practice law.

Selmer testified that he began to view his behavior differently in May 2023 when he started therapy. He later clarified that he experienced this change closer to September 2023, when he commenced therapy with his current therapist, whom he continues to see. Selmer explained that he used to blame "the system" for the consequences of his actions, but that his current therapist helped him realize that he is solely responsible. He acknowledged that he had "repeatedly" harmed himself, his family, the court system, taxpayers, and opposing counsel by engaging in a "pattern" of wasteful litigation. Although Selmer could not identify the specific ethical rules he had violated, he agreed that his misconduct involved "frivolous litigation," "failing to diligently and competently handle cases," "[n]oncompliance with discovery rules and orders," and "[d]isobeying court orders." Regarding his plan for returning to the ethical practice of law, Selmer testified that he would reenter the legal field as a public defender and work toward becoming a civil litigator. Selmer admitted that he did not have any written office procedures to facilitate

6

his return to the ethical practice of law, but he stated that he would take more CLE seminars and "start slowly and carefully rebuilding" his legal network.

Selmer also testified about his work history following his 2015 suspension. He initially obtained a master's degree in journalism from Columbia University but never worked as a paid journalist. Then he held several temporary jobs, including one job as a substitute teacher. But Selmer stopped teaching after his license expired.[1]

Selmer filed a petition to be reinstated in Wisconsin in 2020. During his Wisconsin reinstatement hearing, which was held in November 2020, Selmer testified that he had problems only when he represented himself and that he "[did not] intend to put [himself] in those positions." The Wisconsin Supreme Court reinstated Selmer to the practice of law on two conditions, that he: (1) enter into a payment plan with the Wisconsin Office of Lawyer Regulation (WI-OLR) to pay his outstanding judgments and (2) obtain an attorney mentor.

During his reinstatement hearing in Minnesota, Selmer testified that, following his reinstatement in Wisconsin, he worked as a public defender with the Office of the

---

[1]     The disciplinary committee of the Minnesota Board of Teaching recommended that the board revoke Selmer's teaching license based on his failure to report to the board his 2015 suspension from the practice of law. Selmer demanded a contested hearing but failed to appear for multiple prehearing conferences. Selmer's license expired before the board could hear his case. The board dismissed the matter as moot but determined that it had the authority to revoke Selmer's license based on immoral character or conduct. Selmer appealed this determination to the Minnesota Court of Appeals, and the court of appeals affirmed. *In re Selmer*, No. A16-1362, 2017 WL 3222321, at *1, *4 (Minn. App. July 31, 2017).

7

Wisconsin Public Defender for approximately two years. He was a full-time public defender from August 2021 until February 2022, but he resigned in lieu of termination due to a conflict with his supervisor. Selmer then worked as a contract public defender from February 2022 until September 2023, when he stopped representing clients due to an illness. According to Selmer, during his time as a Wisconsin public defender, he worked on hundreds of cases, complied with all court orders, did not receive any ethical complaints, and did not miss any court hearings. Selmer also testified that he handled a few civil matters after his reinstatement in Wisconsin, including some estate planning matters and a business advising matter. The Director did not rebut Selmer's testimony regarding his post-reinstatement employment.

In addition to his own testimony, Selmer called four witnesses at the hearing: (1) his life partner, (2) his friend and former attorney,[2] (3) his Wisconsin attorney mentor, and (4) an ethics professor at the University of Minnesota Law School.

Selmer's life partner testified that she had known Selmer for about 20 years and considered him to be a person "of high integrity." She also testified that Selmer was calmer and more deliberate since he began therapy and that he no longer blamed others for his misconduct. Selmer's life partner did not provide testimony about Selmer's competence to practice law.

Selmer's friend and former attorney testified that he had known Selmer since around 1980 and was once "jealous" of "how good [Selmer] was" at the practice of law. The

---

[2] This is the same individual who represented Selmer at the July 2023 hearing on Selmer's reinstatement petition.

friend testified that therapy had made Selmer more "present" and "relaxed" and had equipped him with the skills to respond to challenges "rationally and analytically" instead of from a place of trauma. Regarding Selmer's competence to practice law, Selmer's friend testified that Selmer was "perfectly competent intellectually and functionally," as evidenced by his ability to "get a master's degree from Columbia University." Selmer's friend further testified that Selmer "knows how to analyze things" and "is very creative and innovative in his approach to things." But Selmer's friend did not testify about Selmer's specific competence to practice *law*.

Selmer's Wisconsin attorney mentor testified that he met Selmer around 1973, when he and Selmer were attending the University of Wisconsin Law School, and that they reconnected when Selmer asked him to serve as his Wisconsin attorney mentor. The attorney mentor testified that, as Selmer's mentor, he corresponded with Selmer over the phone and via email and submitted quarterly reports to WI-OLR. Although Selmer's mentor testified that Selmer was "highly competent to practice" law, he admitted that this opinion was not based on direct observation but on his "recollections of [Selmer's] communications and work over previous years."

Finally, the law school ethics professor testified that he met Selmer around 2018, when Selmer approached him to discuss the 2015 suspension. The professor testified that Selmer "is an honest man" who has "made some serious mistakes" that he "acknowledges" and "understands." The professor further testified that Selmer was competent to practice law because he is "honest" and "hardworking." But he admitted that he was not particularly

9

familiar with the conduct leading to Selmer's suspension and that he had never worked with Selmer or reviewed his work product.

Following the testimony of Selmer's witnesses, the panel chair told Selmer and his counsel that, given the recency of Selmer's experience in therapy, which Selmer credited for his moral change, it would be helpful for the panel to hear from Selmer's therapist. Selmer declined to call his therapist as a witness.

The Director, who opposed Selmer's petition, submitted a report to the panel containing 83 exhibits. In her report, the Director argued that Selmer should not be reinstated to the practice of law in Minnesota for several reasons. The Director focused on Selmer's recent self-representation in several matters, despite his testimony during his November 2020 Wisconsin reinstatement hearing that he no longer intended to represent himself in legal matters. These matters included two conciliation court actions that were brought against Selmer in January and February of 2020; a personal injury case that Selmer brought against two individuals in August 2020; and a defamation case that Selmer brought against four financial institutions in June 2022. The Director's exhibits showed that Selmer engaged in the same conduct in these more recent matters as he did in the litigation that gave rise to his suspension. In the conciliation court actions, Selmer failed to file appearances, resulting in judgments against him. Selmer failed to comply with court orders and discovery requests in the personal injury case. His discovery violations included failing to provide required disclosures, failing to provide an itemization of damages, and failing to respond to interrogatories and requests for information. Finally, in the financial institution litigation, Selmer failed to file affidavits of service; communicate with the court

and the defendants; and appear at court hearings, including hearings on the defendants' motions to dismiss. In that matter, the district court eventually dismissed Selmer's claims, concluding they were preempted by federal law.

The Director also submitted a screenshot of Selmer's professional website. According to the Director, the website was misleading in that it suggested to the public that Selmer was licensed to practice law in Minnesota. The website front page stated, "Scott Selmer Law, LLC, Trial Lawyers," and it instructed visitors to "Contact Us for Criminal Defense and Civil Litigation." It listed a Minneapolis address and a Minnesota phone number, but it did not provide any information about where Selmer was licensed to practice or refer to a Wisconsin practice.

Finally, the Director noted that Selmer had failed to satisfy the financial conditions of his reinstatement, which required him to set up a payment plan to satisfy his outstanding sanctions and judgments and to make a good-faith effort to pay them. Selmer explained that he made some payments to satisfy his outstanding sanctions but that he did not have the income to make additional payments.

After the hearing, the panel issued findings of fact, conclusions of law, and a recommendation. Two panel members recommended denial of Selmer's reinstatement petition. A dissenting member of the panel disagreed with the recommendation.

In a detailed 54-page decision, the majority panel members found that Selmer had failed to prove by clear and convincing evidence that he had undergone moral change. The panel's primary concern was the recency of Selmer's reported moral change. Additionally, the panel found that Selmer had failed to prove by clear and convincing evidence that he

was competent to practice law. The panel cited multiple facts to support this finding, including the lack of "first-hand knowledge" about Selmer's work performance and work product.[3]

The dissenting panel member disagreed with the panel's finding that Selmer had failed to prove his moral change by clear and convincing evidence. According to the dissenter, the panel applied the wrong standard, imposing a higher burden on Selmer than our case law requires. The dissenter found that Selmer proved his moral change by showing that "through meaningful mental health care, [he] improved his moral position." Although the dissenter did not directly address Selmer's competence to practice law, the dissent noted that Selmer's "discipline[-]free time" practicing in Wisconsin showed that Selmer "can be relied on." The dissenter recommended reinstatement, subject to several conditions set out by the majority panel members.[4]

Selmer ordered a transcript and now challenges many of the panel's findings of fact and conclusions of law. He asks us to reinstate him to the practice of law in Minnesota.

---

[3]     The panel also observed that, although Selmer had satisfied some of the conditions for reinstatement, he had not paid all outstanding sanctions and judgments or set up a payment plan to do so. Nonetheless, the panel recommended that we consider waiving the financial conditions if we determine that Selmer has satisfied the other conditions for reinstatement.

[4]     These conditions would require Selmer to: (1) enter into strict payment plans to satisfy his financial obligations, (2) abstain from representing himself and his relatives in legal matters, (3) meet all court deadlines and comply with all court orders, (4) submit to an annual audit by the Director, and (5) remain on probation for the rest of his legal career.

**ANALYSIS**

The aim of attorney discipline "is not to punish the attorney, but rather to protect the public, safeguard the judicial system, and deter future misconduct by the disciplined attorney and other attorneys." *In re Severson* (*Severson I*), 860 N.W.2d 658, 671 (Minn. 2015). When a suspended attorney petitions for reinstatement, we conduct an independent review of the record before determining whether to reinstate the attorney. *In re Kadrie*, 602 N.W.2d 868, 870 (Minn. 1999). Although we consider a panel's recommendation regarding reinstatement, it is not binding; we are responsible for determining whether an attorney will be reinstated. *Id.*

A significant concern in deciding whether to reinstate an attorney is whether the attorney will again commit misconduct. *See In re Mose* (*Mose II*), 843 N.W.2d 570, 575 (Minn. 2014). In considering whether to reinstate an attorney, therefore, we look for "a change in the lawyer's conduct . . . that corrects the underlying misconduct that led to the suspension." *Id.* Stated otherwise, we consider whether the attorney has experienced "moral change." *In re Mose* (*Mose III*), 993 N.W.2d 251, 257 (Minn. 2023).

"[M]oral change is the most important factor" in determining whether to reinstate an attorney. *In re Stockman*, 896 N.W.2d 851, 857 (Minn. 2017). An attorney seeking reinstatement must prove moral change by clear and convincing evidence. *In re Tigue*, 960 N.W.2d 694, 700 (Minn. 2021). The attorney must generally "show remorse and acceptance of responsibility for the misconduct, a change in the lawyer's conduct and state of mind that corrects the underlying misconduct that led to the suspension, and a renewed commitment to the ethical practice of law." *Mose II*, 843 N.W.2d at 575. Evidence of

13

moral change must come not only from "an observed record of appropriate conduct," but from "the [attorney's] own state of mind and his . . . values." *Stockman*, 896 N.W.2d at 857 (citation omitted) (internal quotation marks omitted).

Moreover, to be reinstated, an attorney must prove by clear and convincing evidence that the attorney is competent to practice law. *Mose III*, 993 N.W.2d at 260. Our case law has often referred to this requirement as "*intellectual* competency to practice law." *See, e.g., id.* (emphasis added) (citation omitted) (internal quotation marks omitted). In the interest of clarity, from this point forward we refer to this element as "competence to practice law."

In addition to proving moral change and competence to practice law, an attorney seeking reinstatement must prove compliance with both the conditions of suspension and the requirements of Rule 18, RLPR.[5] *Id.* at 261 n.5. Our case law has also articulated additional factors that we consider when evaluating a petition for reinstatement: "the attorney's recognition that the conduct was wrong, the length of time since the misconduct and suspension, the seriousness of the misconduct, [and] any physical or mental pressures susceptible to correction." *Stockman*, 896 N.W.2d at 856 (citation omitted) (internal quotation marks omitted).

---

[5] Rule 18, RLPR, sets forth the procedures and requirements for reinstatement to the practice of law in Minnesota. To be reinstated, a suspended attorney must serve a copy of the petition on the Director, file a petition for reinstatement with this court, and pay a filing fee. Rule 18(a), RLPR. The attorney must also pass the bar examination, the professional responsibility portion of the bar examination, and comply with state CLE requirements. Rule 18(e), RLPR.

14

When an attorney petitions for reinstatement, a panel of the Lawyers Professional Responsibility Board makes factual findings, conclusions, and a recommendation regarding the petition. Rule 18(c), RLPR. However, either the Director or the attorney may challenge the panel's recommendation. *Id.* Based on our independent review, we may agree with the panel's recommendation or make our own determination as to whether an attorney's petition for reinstatement should be granted. *See Kadrie*, 602 N.W.2d at 870 ("The responsibility for determining whether a petitioner will be reinstated rests with this court."); *see also Tigue*, 960 N.W.2d at 699 (explaining that we are not bound by a panel's recommendation).

Where, as here, a transcript has been ordered, we will "uphold the panel's factual findings if they have evidentiary support in the record and are not clearly erroneous." *Stockman*, 896 N.W.2d at 856. Factual findings are clearly erroneous if, based on our review of the record, we have a "definite and firm conviction that a mistake has been made." *In re Lyons*, 780 N.W.2d 629, 635 (Minn. 2010) (citation omitted) (internal quotation marks omitted).

Against this legal backdrop, we now consider Selmer's petition for reinstatement. Selmer challenges the panel's decision, arguing that the panel made clearly erroneous factual findings and that it committed errors of law. He also asks us to independently review the record and to conclude that he should be reinstated to the practice of law.

I.

We first consider Selmer's challenges to the panel's decision. These challenges fall into two categories. First, Selmer challenges several factual findings as clearly erroneous.

15

Second, citing our decision in *In re Trombley*, 947 N.W.2d 242 (Minn. 2020), Selmer alleges that the panel committed errors of law.

A.

As noted, when a party orders a transcript of the panel hearing, we apply clear error review in considering the panel's factual findings. *Stockman*, 896 N.W.2d at 856. We will uphold factual findings if the record supports them and they are not clearly erroneous. *Id.*

Selmer contends that the panel clearly erred by: (1) finding that the "evidence of [Selmer's] acceptance of responsibility is mixed"; (2) finding that Selmer's website misled the public into believing that Selmer was licensed to practice law in Minnesota; (3) improperly considering Selmer's self-representation between 2020 and 2023, which occurred *before* he began therapy; (4) finding that Selmer was untruthful when he testified at his Wisconsin reinstatement hearing that he would no longer represent himself in legal proceedings; (5) "disregard[ing]" testimony about Selmer's competence to practice law; and (6) failing to sufficiently credit Selmer's testimony regarding his recent practice as a public defender in Wisconsin. We consider each of these alleged errors below.

1.

The panel found that Selmer's "evidence of acceptance of responsibility [is] mixed." Selmer argues that this finding is clearly erroneous because he testified that he understood "the particulars of his mistakes," he was "embarrassed" by his past conduct, and he "unequivocally acknowledged" that his 2015 suspension resulted from his own misconduct.

16

The record supports the panel's finding. Selmer correctly notes that he testified during the reinstatement hearing that he had accepted responsibility for his actions. But there was also evidence from which the panel could infer that Selmer's acceptance of responsibility was mixed. Between 2020 and 2023, Selmer engaged in the same behavior that resulted in his 2015 suspension, including failing to comply with court orders and court rules, failing to respond to discovery requests, and filing frivolous actions. Selmer did not satisfy his outstanding sanctions and judgments or work with the Director to create a payment plan before seeking reinstatement. He did not comply with the payment plan established in Wisconsin when he was reinstated there. When he petitioned for reinstatement in Minnesota, Selmer refused to be interviewed by the Director's office, and his attorney at the time referred to the Director's investigation as a "charade." Selmer served the Director with "requests for admission" regarding his underlying discipline going back to 1995, and when the Director objected to responding, he moved to have his requests for admissions admitted at the first scheduled reinstatement hearing. The panel denied this motion because requests for admissions are not a tool provided for by Rule 18, RLPR. And Selmer attended the first scheduled hearing in this matter planning to relitigate some of the conduct underlying his suspension. Given this evidence in the record, the panel did not clearly err in finding that Selmer's acceptance of responsibility was "mixed."

2.

The panel found that, for much of his suspension, Selmer "has maintained a website that makes it appear as if he [is] a lawyer practicing law in Minnesota, which [is] a violation

17

of the Rules of Professional Conduct since he [is] under suspension."[6] Selmer contends that his website did not mislead the public into believing that he was licensed to practice law in Minnesota because it included true facts—that he had a Minnesota address and phone number—and it did not explicitly state that he was licensed to practice in Minnesota.

We disagree. According to the record evidence, the website was titled, "Scott Selmer Law, LLC, Trial Lawyers," and it instructed visitors to "Contact Us for Criminal Defense and Civil Litigation." The only contact information the website provided was a Minneapolis address, a Minnesota phone number, and Selmer's email address. The website did not contain any other information about Selmer or make any reference to Wisconsin. Based on the information on Selmer's website, an unwitting member of the public would believe that Selmer was licensed to practice law in Minnesota when he was not. Therefore, the panel did not clearly err in finding that Selmer's website was misleading.

3.

Regarding Selmer's period of self-representation between 2020 and 2023, the panel stated:

> In assessing the genuineness of [Selmer's] moral change, the Panel cannot ignore the fact that from 2020-2023, [Selmer] filed lawsuits in personal

---

[6] The Minnesota Rules of Professional Conduct prohibit "[a] lawyer who is not admitted to practice in Minnesota" from "hold[ing] out to the public or otherwise represent[ing] that the lawyer is admitted to practice Minnesota law." Minn. R. Prof. Conduct 5.5(b)(2). Additionally, the rules prohibit a lawyer from "mak[ing] . . . false or misleading communications[s] about the . . . lawyer's services." Minn. R. Prof. Conduct 7.1. "A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading." *Id.*

18

matters without following court rules or procedures, failed to respond to discovery or attend hearings or conferences in those matters, and filed a defamation claim which was preempted by federal law, many of the same types of conduct that led to his 2015 suspension.

Selmer argues that the panel clearly erred in considering his self-representation during this period because it occurred *before* he started therapy.

To the extent that Selmer is arguing that the panel committed an error of law in considering his conduct between 2020 and 2023, we are not persuaded. Determining whether an attorney petitioning for reinstatement has proven moral change requires a holistic assessment, *see In re Severson* (*Severson II*), 923 N.W.2d 23, 30 (Minn. 2019), of the attorney's conduct during "the time period near the reinstatement hearing," *Trombley*, 947 N.W.2d at 248. We have never defined this time period in months or years. But under the circumstances here—where Selmer was suspended in 2015 and petitioned for reinstatement in early 2023—the panel would have been remiss if it had ignored Selmer's pattern of concerning litigation conduct between 2020 and 2023. Evidence of moral change must come from "an observed record of appropriate conduct" in addition to "the [attorney's] own state of mind and his . . . values." *Stockman*, 896 N.W.2d at 857 (citation omitted) (internal quotation marks omitted).

Moreover, the panel fully acknowledged that Selmer did not represent himself in any legal matters after commencing therapy. The panel stated, "[Selmer] has not filed any complaints on his own behalf since he began therapy in May of 2023." It also acknowledged Selmer's testimony that he has learned from his therapy "to defer to legal

19

counsel and to listen to other people" because he can "be emotional when directly involved in some things."

Under the circumstances here, we discern no error in the panel's consideration of Selmer's conduct both before and after he began therapy. And because the record supports the panel's factual findings, they are not clearly erroneous.

4.

The panel found that Selmer's period of self-representation between 2020 and 2023 was "particularly concerning" because Selmer testified in the Wisconsin reinstatement proceeding "that he did not intend to represent himself any longer, even though he was at the time representing himself in a frivolous matter and subsequently commenced another frivolous matter in which he represented himself." Selmer challenges this finding as clearly erroneous because the self-representation occurred before he began therapy in May 2023.

We disagree. In November 2020, Selmer testified at the Wisconsin reinstatement hearing that he would avoid representing himself in the future. Selmer stated that he had problems only when he represented himself and that he "[did not] intend to put [himself] in those positions." However, in August 2020, three months *before* the Wisconsin reinstatement hearing, Selmer filed a personal injury action for injuries he allegedly sustained during a car accident in August 2014. Selmer did not mention this litigation during his Wisconsin reinstatement hearing. Moreover, in June 2022—*after* the Wisconsin reinstatement hearing—Selmer filed another action against four financial institutions for reporting his debts to credit reporting agencies (as they are required to do under the Fair

20

Credit Reporting Act, 15 U.S.C. § 1681s-2(a)(5)). Because Selmer testified that he would avoid representing himself *while he was representing himself* in the personal injury matter, and because Selmer represented himself again just two years later in the financial institution litigation, the panel did not clearly err in finding that Selmer's testimony that he would avoid representing himself in the future was concerning.

5.

Selmer argues that the panel improperly "disregarded" the testimony of his witnesses regarding his competence to practice law. Of Selmer's four witnesses, three addressed his competence: (1) Selmer's friend and former counsel, (2) Selmer's Wisconsin attorney mentor, and (3) the legal ethics professor. Selmer's friend testified that Selmer was once a formidable attorney. The Wisconsin attorney mentor testified that he had a general sense that Selmer was competent to practice law based on his memory of Selmer's previous work, but he acknowledged that he was not familiar with Selmer's current work. And the ethics professor testified that Selmer had the skills necessary to practice law but admitted that he did not know Selmer's work.

Contrary to Selmer's assertion, the panel did not "disregard[]" the testimony of these witnesses. The panel detailed the testimony of each witness and summarized its view of the testimony. As to Selmer's friend, the panel found that he was a sincere and credible witness, but that his testimony was not helpful in assessing whether Selmer was currently competent to practice law because he did not provide specific insight into Selmer's current ability to practice. Selmer's Wisconsin attorney mentor testified that Selmer was competent, but he admitted that he did not have the expertise to offer an opinion about the

21

public defender work that Selmer had performed in Wisconsin and that he had not reviewed any of that work. The panel found the attorney mentor to be sincere. But it concluded that the attorney mentor did not have firsthand knowledge regarding Selmer's competence. Finally, the panel found that because the ethics professor had not seen any of Selmer's work, his testimony about Selmer's competence lacked sufficient foundation and factual basis and was therefore not useful.

The panel also addressed the impact of the witnesses' testimony on its conclusion that Selmer had failed to establish his competence by clear and convincing evidence. It stated, "[Selmer's] character witnesses did not assist in satisfying his burden of proof because none of them were able to testify about any specific legal work [Selmer] has engaged in since 2015, nor did anyone testify to how any insights [Selmer] has gained in therapy will likely transfer to his legal practice."

Based on our review of the panel's decision, we reject Selmer's argument that the panel "disregarded" the testimony of Selmer's witnesses regarding his competence. The panel considered the testimony of each witness. And the panel expressly factored the witnesses' testimony into its conclusion that Selmer had failed to satisfy his burden of proof as to his competence to practice law.

6.

Relatedly, Selmer argues that, in considering his competence to practice law, the panel failed to sufficiently credit his testimony about his recent work as a public defender in Wisconsin. He contends that the panel did not give enough weight to his testimony that he received no ethical complaints during this period. And, according to Selmer, the panel

held him to an impossibly high standard when it faulted him for not producing corroborating evidence regarding his Wisconsin public defender work.

The panel made multiple factual findings regarding Selmer's work as a public defender in Wisconsin, which Selmer does not challenge. It found that Selmer worked as a public defender in Hudson, Wisconsin from August 2021 until February 2022 when he "chose to resign his position . . . in lieu of termination," he worked as a contract public defender until September 2023, and he handled "up to 250 cases" between February 2022 and September 2023. Moreover, the panel found that Selmer has not been disciplined in Wisconsin since his reinstatement. It also noted Selmer's testimony that he had received no complaints from judges or clients while working as a public defender in Wisconsin. Indeed, the panel stated that it credited Selmer's testimony "on these subjects as true and accurate."

However, ultimately the panel was not convinced that Selmer's testimony about his work as a Wisconsin public defender was clear and convincing evidence of his competence to practice law. In support of this conclusion, the panel cited other factual findings:

> [Selmer] presented no evidence of the type of legal work he did, such as writing briefs, arguing motions, or trying bench or jury trials. Nor did [Selmer] offer examples of his written work product or court orders resulting from his advocacy from which the Panel could assess the quality of his work in order to determine his intellectual competence. The Panel does not know whether the 250 cases [Selmer] handled in Wisconsin were all plea bargains negotiated at a first appearance, or whether they represented efforts by [Selmer] in complex cases with legal issues requiring extensive legal analysis or whether they fell across a spectrum of legal difficulty.

Selmer does not challenge any of the panel's factual findings regarding his work as a Wisconsin public defender. Because the record supports these factual findings, they are

not clearly erroneous. Moreover, to the extent that Selmer is challenging the panel's ultimate conclusion that he is not competent to practice law, we are not bound by that conclusion. *See Tigue*, 960 N.W.2d at 699. We consider Selmer's competence to practice law as part of our independent review of his petition for reinstatement. *See infra* Part II.

B.

In his second category of challenges to the panel's decision, Selmer relies on our decision in *Trombley* to argue that the panel committed errors of law. Before turning to Selmer's specific arguments, we summarize the *Trombley* decision.

In 2018, we indefinitely suspended attorney Trombley from the practice of law, with no right to petition for reinstatement for at least six months, for converting funds that belonged to her stepfather while exercising power of attorney on behalf of her mother. *Trombley*, 947 N.W.2d at 244–45. When Trombley's mother became ill, Trombley transferred $95,000 from her mother and stepfather's joint bank accounts to her personal bank account. *Id.* at 245. Following her mother's death, Trombley did not return the funds, even though they belonged to her stepfather, and she used a portion of the funds for herself. *Id.* When an investigation into the missing funds began, Trombley returned the funds on her own initiative. *Id.* We suspended Trombley for this misconduct. *Id.*

While she was suspended, Trombley continued to work for her employer in the non-legal role of project manager. *Id.* at 244. Approximately seven months after her suspension, she petitioned for reinstatement to the practice of law. *Id.* at 244–45. During her reinstatement hearing, Trombley testified that she sought therapy after her suspension and that her therapist helped her understand and accept responsibility for her misconduct.

24

*Id.* at 248. Trombley's husband also testified at the hearing. *Id.* at 245. According to Trombley's husband, Trombley recognized her conduct as dishonest only "within these past five months." *Id.* at 247 (internal quotation marks omitted). Based on the evidence presented at the hearing, the panel concluded that Trombley had not met her burden of proving moral change, and it recommended denying reinstatement. *Id.* at 245. The Director agreed with the panel's recommendation. *Id.*

We reversed, determining that the panel erred in finding that Trombley had failed to prove moral change. *Id.* at 246. Specifically, we held that the panel had improperly focused on Trombley's mental state at the time of the misconduct rather than at the time of the reinstatement hearing, which is the relevant time period under our case law. *Id.* at 247–48; *see also In re Dedefo*, 781 N.W.2d 1, 9 (Minn. 2010) ("[W]e examine a petitioner's conduct up to the time of the reinstatement hearing and his or her mental state and values at that time."). Because the panel applied the incorrect law, we determined that its conclusion that Trombley had failed to clearly and convincingly show that she was remorseful and had accepted responsibility was clearly erroneous. *Trombley*, 947 N.W.2d at 248–49. Then, based on our independent review of the record, we concluded that Trombley had proven by clear and convincing evidence that she had undergone moral change and had satisfied the other requirements for reinstatement. *Id.* at 250.

Throughout Selmer's brief, he argues that the circumstances in his case are substantially similar to those in *Trombley* because, like Trombley, he experienced moral change within a relatively short period of time after commencing therapy. He suggests that our decision in *Trombley* proves that the panel erred as a matter of law in recommending

25

denial of his reinstatement petition. However, we reject Selmer's general comparison of *Trombley* to the circumstances here. Trombley engaged in one instance of misconduct immediately followed by a period of therapy and change. On the other hand, Selmer has had an extensive disciplinary history spanning several decades and two states. He has been suspended from the practice of law since 2015. And up until—and even during—the reinstatement proceedings, Selmer continued to engage in questionable conduct, including a pattern of irresponsible behavior in his *pro se* litigation; communicating, through counsel, that the Director's investigation was a "charade"; and planning to relitigate the conduct underlying his 2015 suspension at the first hearing on his reinstatement petition. We therefore disagree with Selmer that the panel's recommendation to deny his petition for reinstatement directly contravenes our decision in *Trombley.*

Based on our decision in *Trombley*, Selmer further contends that the panel erred in (1) suggesting that he call his therapist as a witness regarding his moral change and then drawing a negative inference from his decision not to call the therapist, (2) incorrectly weighing the evidence that he presented regarding his moral change, and (3) improperly focusing on the recency of his asserted moral change. We next consider each of these challenges.

1.

Selmer argues that the panel improperly suggested that he should call his therapist as a witness at the reinstatement hearing to prove his moral change. He further contends that the panel drew a "negative" and "unfounded" inference from his decision not to call the therapist.

26

As Selmer notes, we have never required a petitioner to present corroborating testimony of moral change to be reinstated. *See In re Sand*, 951 N.W.2d 918, 923 (Minn. 2020). Our case law confirms that a petitioner can prove moral change and be reinstated without such testimony. *See id.*; *see also Trombley*, 947 N.W.2d at 246–50 (concluding that the petitioner proved moral change based largely on petitioner's testimony).

On its face, the panel chair's suggestion for Selmer to call the therapist was not unlawful or inappropriate. Our case law does not prohibit such a request. Likewise, we are not convinced that the panel made any *improper* inference from Selmer's decision not to call his therapist. Although the two panel members in the majority found it "concerning" that Selmer was unwilling to call his therapist as a witness, this concern was one of many that the panel identified regarding Selmer's evidence of moral change.

Selmer argues that our decision in *Trombley* highlights the panel's error in asking him to call the therapist as a witness. He points out that, in *Trombley*, we determined that moral change can be recent and based on less evidence than he presented. *See Trombley*, 947 N.W.2d at 248–49.

Although we did determine in *Trombley* that moral change can be recent and that evidence from a single character witness may be sufficient to prove moral change, our decision in *Trombley* is based on the factual circumstances presented there. Nothing in *Trombley* suggests that certain evidence will *always* be sufficient to satisfy a petitioner's burden of proof. *See id.* at 246–50 (discussing moral change). Nor does *Trombley* hold that a panel cannot request additional evidence of moral change during a hearing. *See id.*

We discern no error in the panel's suggestion at the reinstatement hearing that testimony from Selmer's therapist would be helpful. Moreover, because the panel's findings and legal conclusions do not support Selmer's related argument that the panel drew an improper inference from his decision not to call the therapist, we likewise reject that argument.

2.

Selmer contends that the panel erred in rejecting the testimony of his character witnesses regarding his moral change. He again relies on *Trombley*, arguing that he provided more evidence of moral change than the petitioner in that case by calling more character witnesses.

We did not hold in *Trombley*, however, that a panel must always find moral change based on a particular quantum of evidence. To the contrary, a panel must evaluate each case based on the evidence presented. *See* Rule 18(c), RLPR (providing that a panel may conduct a hearing and shall make findings of fact, conclusions, and recommendations to this court); *cf. Stockman*, 896 N.W.2d at 856 ("[W]e uphold the panel's factual findings if they have evidentiary support in the record and are not clearly erroneous.").[7]

---

[7] For the same reason, we reject Selmer's argument that our decision in *In re Sanchez* shows that Selmer had undergone moral change. 985 N.W.2d 352, 354 (Minn. 2023). Sanchez petitioned for reinstatement after being indefinitely suspended from the practice of law in Minnesota as reciprocal discipline for misconduct that occurred in Nevada. *Id.* at 352–53. At the reinstatement hearing, Sanchez testified on his own behalf and presented the testimony of two family members, who testified that Sanchez was remorseful and had significantly changed his behavior since his suspension. *Id.* at 353–54. The panel credited the witnesses' testimony, found that Sanchez had proven moral change by clear and convincing evidence, and recommended that Sanchez be reinstated and placed on

28

In any event, we are not bound by the panel's ultimate conclusion regarding moral change. *See Tigue*, 960 N.W.2d at 699. We consider whether Selmer proved moral change by clear and convincing evidence as part of our independent review of his petition for reinstatement. *See infra* Part II.

3.

Again citing *Trombley*, Selmer argues that the panel erred in attempting "to pinpoint an exact time when" his moral change occurred. He contends that the panel "placed undue emphasis and speculation on the exact time when [he] underwent moral change." Although Selmer's argument is unclear, we construe it as a challenge to the panel's concern that Selmer's moral change was too recent to be genuine.

In *Trombley*, we determined that the panel had improperly focused on Trombley's mental state at the time of her misconduct rather than at the time of her reinstatement hearing. 947 N.W.2d at 247–48. We further determined, based on the facts presented there, that Trombley had undergone moral change during the period before her reinstatement hearing. *Id.* at 250.

Selmer seems to argue that *Trombley*—where the attorney's moral change occurred within a relatively short period of time—created a rule of law that the timing of moral change is irrelevant. And based on that premise, he suggests that the panel erred as a matter of law in focusing on the timing of his purported moral change.

---

probation. *Id.* at 353. We agreed that Sanchez had met his burden of proving moral change, and we reinstated him to the practice of law in Minnesota, subject to several conditions. *Id.* at 354. Our decision in *Sanchez* is based on the particular factual circumstances in that case.

We do not accept Selmer's premise. Our case law is clear that whether an attorney has experienced moral change is a fact-intensive and case-specific inquiry. *See Severson II*, 923 N.W.2d at 30. And, as noted, the facts in *Trombley* are vastly different from the facts before us here. Accordingly, the panel did not err as a matter of law in considering the recency of Selmer's moral change among the other facts in evidence.

\*     \*     \*

In sum, we reject Selmer's challenges to the panel's decision. The panel's factual findings are supported by the record and are not clearly erroneous. Moreover, the panel's decision did not misapply our case law.

## II.

Selmer asks us to determine, based on our independent review, that he met his burden of proving by clear and convincing evidence that he should be reinstated to the practice of law in Minnesota. To be reinstated to the practice of law in our state, an attorney must prove: "(1) moral change; (2) the . . . competence to practice law; (3) compliance with the conditions of suspension; and (4) compliance with the requirements of Rule 18, RLPR." *Mose III*, 993 N.W.2d at 261 n.5. We also consider four other factors when determining whether to reinstate an attorney: "the attorney's recognition that the conduct was wrong, the length of time since the misconduct and suspension, the seriousness of the misconduct, and any physical or mental pressures susceptible to correction." *Id.* We now consider whether Selmer has satisfied the requirements for reinstatement.

## A.

We first address whether Selmer has proven by clear and convincing evidence that he has undergone moral change. We independently consider this question, deferring to the panel's underlying factual findings and credibility determinations if they have evidentiary support but not to its ultimate recommendation as to whether the lawyer proved moral change. *See Tigue*, 960 N.W.2d at 699. When evaluating moral change, "we examine a petitioner's conduct up to the time of the reinstatement hearing and his or her mental state and values at that time." *Dedefo*, 781 N.W.2d at 9. We also defer to a panel's determination that a petitioner's testimony regarding moral change is or is not credible. *Id.*

Although Selmer testified at his reinstatement hearing that he regretted his past conduct, we conclude that he has not met his burden of proving moral change.

Generally, to prove moral change, an attorney must show "remorse and acceptance of responsibility for the misconduct." *Mose II*, 843 N.W.2d at 575. An attorney shows remorse and acceptance of responsibility when the attorney expresses "genuine regret and moral anguish for his or her conduct and the effect it had on others." *Severson I*, 860 N.W.2d at 670. Genuine remorse exists when an attorney "has gradually come to realize the wrongfulness of his conduct and . . . has ceased blaming others and taken full responsibility for his actions." *Trombley*, 947 N.W.2d at 247 (quoting *Dedefo*, 781 N.W.2d at 9) (alteration in *Trombley*). But mere regret about the effect of the misconduct on the attorney is not sufficient. *See Severson I*, 860 N.W.2d at 670; *In re Aitken*, 787 N.W.2d 152, 163 (Minn. 2010).

31

Selmer did express remorse and accept responsibility for his misconduct during his reinstatement hearing. However, given Selmer's history—including the pattern of conduct that resulted in the 2015 suspension, Selmer's representation during the Wisconsin reinstatement proceeding that he would not represent himself in the future and his failure to keep that promise, his conduct during his recent self-representation, his plan at the first reinstatement hearing to contest one of the incidents underlying the 2015 suspension, and the recency of his expressed moral change—we are concerned about the genuineness of Selmer's remorse and acceptance of responsibility.

Based on these same facts, we also question whether Selmer has experienced a change in his state of mind that corrects the misconduct leading to his suspension. *See Mose II*, 843 N.W.2d at 575. Selmer's conduct during the 2020 collection actions, the 2020 personal injury action, and the 2022 financial institution litigation resembled the misconduct that resulted in his 2015 suspension. During his recent litigation, he failed to file appearances, comply with court orders, respond to discovery requests, and communicate with opposing counsel. Selmer also maintained a misleading website that suggested he was licensed to practice law in Minnesota until at least June 2024, even after the Director asked Selmer questions about the website and whether it "fully convey[ed] to the public his practice/licensure status in Minnesota." And Selmer never set up a payment plan with the Office of Lawyers Professional Responsibility to satisfy his outstanding sanctions and judgments in Minnesota, a large portion of which still has not been paid. Selmer's recent conduct, which is similar to his long history of misconduct, suggests that his state of mind has not changed. Although Selmer's participation in therapy and

expressions of regret about his past conduct are hopeful signs that he will undergo a true change in his state of mind in the future, the evidence does not clearly and convincingly show that this change has yet occurred.

Selmer likens his circumstances to those in *Trombley*, where we held—based solely on the testimony of the attorney and her husband—that the attorney had experienced a change in her state of mind soon before her reinstatement hearing. *Trombley*, 947 N.W.2d at 249. Selmer argues that his moral change is likewise recent but genuine. He also points out that several witnesses corroborated his testimony about his changed mindset.

However, as discussed, the evidence in *Trombley* and the factual circumstances here are divergent. Trombley engaged in a single instance of misconduct, immediately followed by a period of therapy and change. Selmer has an extensive disciplinary history, which spans decades and two states. His 2015 suspension resulted from a pattern of misconduct that occurred over several years. Selmer continued to engage in similar conduct after his 2015 suspension and until recently. And Selmer appeared to deny the wrongfulness of some of the conduct that resulted in his suspension up until the first hearing held on his current reinstatement petition. Given the substantial differences between the facts of the two cases, Selmer's comparison to *Trombley* is misplaced.

As Selmer's brief acknowledges, our case law shows that there is no single formula for proving moral change. *See Sand*, 951 N.W.2d at 923 (explaining that we have never required a petitioner to produce "a *specific type* of evidence" to prove moral change but rather have "considered the *quality* of a petitioner's evidence"). Whether a petitioner has presented clear and convincing evidence of moral change is a holistic and case-specific

inquiry. *See Severson II*, 923 N.W.2d at 30 ("The proper inquiry is whether, based on the entire record, the attorney has met his or her burden of proving moral change by clear and convincing evidence."). While one attorney may be able to establish moral change based solely on his own testimony, another may not. Likewise, while one attorney may be able to prove moral change through his testimony and the testimony of one or more family members, another may fall short.

Finally, we are not convinced that Selmer has demonstrated a renewed commitment to the ethical practice of law. "We do not require that an attorney show an airtight plan to return to the practice of law." *In re Klotz*, 996 N.W.2d 165, 172 (Minn. 2023). But "an attorney's plan to return to the practice of law or implement systems to avoid future misconduct are factors that may be relevant to whether an attorney has shown a renewed commitment to the ethical practice of law." *Severson II*, 923 N.W.2d at 32. When an attorney's plan to return to the practice of law is "vague and undefined," we may conclude that it does not demonstrate a renewed commitment to ethical practice. *See Klotz*, 996 N.W.2d at 172–73 (determining that the attorney's plan to return to practice after an indefinite suspension, which included seeking mentoring and building a professional network, was "too vague and undefined" to show a renewed commitment to the ethical practice of law).

Selmer testified that he would start practicing as a public defender and work toward becoming a civil litigator. He told the panel that he would use CLE materials to learn "how to manage law offices," but he presented no formal plan. Selmer testified that he would start rebuilding his legal network and lean on his brother and other attorneys for support.

He did not testify about specific plans to ethically manage his practice if he were to be reinstated. We conclude that Selmer's nonspecific ideas did not sufficiently demonstrate his renewed commitment to the ethical practice of law.

We laud Selmer's participation in therapy and his work to gain insight into his conduct. But based on our independent review of the entire record, we conclude that Selmer has not met his "heavy burden" of proving moral change by clear and convincing evidence. *Id.* at 173. Stated otherwise, we are not convinced, based on the evidence in the record, that there is a high probability that Selmer has experienced moral change. *See In re Houge*, 764 N.W.2d 328, 335 (Minn. 2009).[8]

B.

We next address whether Selmer has proven by clear and convincing evidence that he is competent to practice law. As with moral change, we conclude that Selmer has not met this burden.

An attorney petitioning for reinstatement must prove by clear and convincing evidence that the attorney is competent to practice law. *Mose III*, 993 N.W.2d at 260. We

---

[8]     The dissenting panel member expressed concern about the panel majority's use of the clear and convincing evidence standard that we articulated in *Gassler v. State*, 787 N.W.2d 575 (Minn. 2010). In *Gassler*, we stated that "to prove a claim by clear and convincing evidence, a party's evidence should be unequivocal, intrinsically probable and credible, and free from frailties." *Id.* at 583 (citing *Kavanagh v. The Golden Rule*, 33 N.W.2d 697, 700 (Minn. 1948)). While the panel's use of the *Gassler* standard was not plainly erroneous, we encourage the use of a simpler definition: clear and convincing evidence "requires a high probability that the facts are true." *Houge*, 764 N.W.2d at 334. The standard is higher than a preponderance of the evidence but lower than proof beyond a reasonable doubt. *Lyons*, 780 N.W.2d at 635.

impose this requirement on petitioning attorneys "to protect the public, protect the judicial system, and deter future misconduct." *Id.* at 260 n.4 (citation omitted) (internal quotation marks omitted). Although we have no fixed standard for determining a petitioner's competence to practice law, "[w]e generally consider the extent to which petitioner has remained acquainted with legal matters." *Stockman*, 896 N.W.2d at 863 (citation omitted) (internal quotation marks omitted); *see also In re Jellinger*, 728 N.W.2d 917, 922 (Minn. 2007) (concluding that the petitioner had "current legal skills and knowledge, demonstrated by his successful completion of the professional responsibility exam, satisfaction of his CLE requirements, and his work as a paralegal"); *Kadrie*, 602 N.W.2d at 873 (completion of CLE credits and work arranging contracts and assigning legal matters to counsel was sufficient); *In re Trygstad*, 472 N.W.2d 137, 139 (Minn. 1991) (completion of CLE credits and work as a paralegal was sufficient). "[W]ork experience that requires legal reasoning and case management is one way to show competence to practice law." *Mose II*, 843 N.W.2d at 576. However, "[w]hen an attorney is suspended for incompetence and lack of diligence, and has not practiced law for an extended period of time, the attorney must not only pass the bar examination, but also demonstrate legal reasoning and case management skills through paid- or volunteer-work experience." *Id.* at 577; *see also In re Hanson*, 454 N.W.2d 924, 926 (Minn. 1990) (CLE credits and work as personal representative was not sufficient, in part, because petitioner had not practiced law for 35 years).

Selmer was admitted to practice law in Minnesota in 1984. After a long history of misconduct, we suspended Selmer from the practice of law in 2015 due to a pattern of misconduct related to his work as an attorney. Following his suspension, Selmer did not practice law for approximately five years. Selmer was reinstated in Wisconsin in 2021, and according to his testimony at the hearing, he practiced in Wisconsin for a couple of years before seeking reinstatement here.[9]

Notwithstanding Selmer's testimony that his recent practice in Wisconsin demonstrates his competence to practice, we have significant concerns. None of Selmer's witnesses were able to provide firsthand information regarding Selmer's current competence. Selmer's testimony was the only evidence of competence to practice law. He testified that since his reinstatement in Wisconsin, he had handled hundreds of cases while working as a public defender and a few civil matters, including some estate planning matters and a business advising matter. But Selmer did not provide any specific information about the type of work that he performed while working as a public defender. He also acknowledged resigning his public defender position in lieu of termination. Additionally, Selmer's conduct during the 2020 collection actions, 2020 personal injury action, and 2022 financial institution litigation calls his competence into question. Given these circumstances and based on our independent review of the record, we conclude that Selmer has not met his burden of proving by clear and convincing evidence that he is competent to practice law.

---

[9]     We have not required Selmer to pass a full bar examination to be readmitted.

\*     \*     \*

Because Selmer did not prove by clear and convincing evidence his moral change or competence to practice law,[10] we conclude that Selmer has not met his burden of proving that he is entitled to reinstatement.

Petition denied.

PROCACCINI, J., took no part in the consideration or decision of this case.

---

[10] Given our determination that Selmer failed to prove his moral change or competence to practice law by clear and convincing evidence, we do not consider the four additional factors for reinstatement identified in our case law. *See Mose III*, 993 N.W.2d at 260.